## Case No. 2,413.

### The CARLOTTA.

[9 Ben. 1.] [1]

District Court, S. D. New York. Jan. 1877.[2]

CHARTER—BILL OF LADING — DAMAGE BY RATS — PERIL OF THE SEA — DAMAGE BY PETROLEUM—CLEANSING OF VESSEL —SALE OF GOODS TO ARRIVE.

1. The bark C. was chartered at New York by G. & A. to carry a cargo of fruit from certain ports in Spain to New York, it being understood that the vessel was then bound to Barcelona with a cargo of petroleum, and it being provided in the charter that the vessel was to be "cleaned as customary previous to loading homeward cargo." The vessel was fumigated to destroy rats before she took on board any of the return cargo, and had on board a cat and a rat-terrier, and was cleansed after the cargo of petroleum was unloaded. The master gave certain bills of lading for the return cargo, with the usual exceptions as to acts of God and dangers and perils of the sea. These bills of lading were all made to, or assigned to, the charterers. The cargo was sold by the consignees to arrive, and they obtained a full price for it. When the vessel arrived in New York, some of the cargo was found to be damaged by the gnawing of rats, and also to be impregnated with the taste and smell of petroleum. G. & A. sued the vessel under the bills of lading: Held, that where the owner of the vessel, notwithstanding the charter-party, enters into special contracts, through the master, in respect to the carriage and delivery of the goods, the bills of lading must be regarded as the contracts by which the rights of the parties are to be governed, so far as respects the matters provided for therein.

[See Two Hundred and Sixty Hogsheads of Molasses, Case No. 14.296; Lamb v. Parkman, Id. 8,020; Perkins v. Hill, Id. 10,987, affirming Id. 10,986; Carr v. Austin & N. W. R. Co., 14 Fed. 419.]

2. That loss or damage by rats is not an act of God, nor a danger or accident of the sea.

[See note at end of case.]

3. That the fact of damage by rats is sufficient evidence that sufficient care and skill was not exercised to rid the vessel of rats.

4. That the fact of damage by petroleum must be accepted as evidence that the vessel was not cleaned in the customary or proper manner, as required by the charter.

[See The Lizzie W. Virden, 11 Fed. 903.]

5. That where merchandise is sold to arrive, for a price based on undamaged goods, and that price has been paid in full, but it is not shown that the right of property and the right of possession were not in the vendor when the breach of contract or neglect of duty complained of occurred, the vendor can maintain an action against the carrier for damage to the goods; but where there has been a rebate of duties for loss or damage in respect of any goods as to which an allowance shall be found due in favor of the consignees, they must be charged with that sum.

[Disapproved in The Eroe, Case No. 4,521. Distinguished in same case, on appeal, Id. 4,522.]

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed by Circuit Court. Case No. 2,413a.]

In admiralty.

Beebe, Wilcox & Hobbs, for Gomez & Arguimbau.

Benedict, Taft & Benedict, for Bliss and the Carlotta.

BLATCHFORD, District Judge. William Bliss, as owner of the bark Carlotta, filed a libel on the 13th of February, 1874, against Raphael M. Gomez and Daniel V. Arguimbau, to recover the amount due on a written charter of the bark Carlotta to the respondents. The libel alleges that the vessel performed the charter in all respects and became entitled to receive the charter money therein specified, and that $1,000 or thereabouts still remains due thereon. The charter party, which was made at New York on the 8th of August, 1873, between the agents of the owner of the vessel, then lying at New York, and the respondents, under the co-partnership name of Gomez & Arguimbau, charters the vessel to the respondents "for a voyage from two ports in Spain between Barcelona and Malaga, both inclusive, and including Ivica, to New York—charterers have privilege also of taking part cargo at Barcelona, and then using two ports to load, if required—on the terms following." Among those terms are, that the vessel shall receive on board during the voyage "a full cargo of fruit and other lawful merchandise," and that no merchandise shall be laden otherwise than for the respondents, without their consent, on pain of forfeiture of the amount of freight agreed upon; that on arrival out the captain is to report by telegraph to R. M. Gomez at Malaga, and follow his instructions in reference to the charter; that the respondents are to pay to the owner for the use of said vessel during said voyage, in cash, free of commissions, on delivery of the cargo at the port of discharge, $2,500 in United States currency; and that "it is understood that said vessel is now bound to Barcelona, with a cargo refined petroleum in bbls., whence she shall proceed immediately after discharge of outward cargo to enter upon this charter—vessel to be cleaned as customary previous to loading homeward cargo."

The answer of Gomez & Arguimbau to the libel of Bliss was filed on the 26th of March, 1875. It admits the execution and contents of the charter party, as set forth in the libel, and avers that under said charter party the respondents delivered to the master of the vessel certain merchandise in barrels, bales and bags, to be transported to the port of New York from Spain; that such merchandise was shipped and received on board of said vessel under certain bills of lading which recited that said merchandise was received in good order, and by which the master and owners of the vessel promised to deliver the same to the respondents at the port of New York in the like good order and condition as received, on payment of freight as therein provided; and that the master and employees of said vessel took so little and such bad care, in putting said cargo on board and in storing it and in attending to it while on board and while landing it, that a large part of said cargo was badly stained by petroleum or other such substance, and also impregnated by the smell arising therefrom, and thus rendered unmerchantable; and many of the bags and packages containing said merchandise, and the contents thereof, were badly eaten by rats or other vermin, and in other ways the said cargo was so badly damaged by the negligence of said master and owners that part of said cargo was wholly lost and other parts damaged to the amount altogether of at least $2,000.

On the 17th of February, 1874, Gomez & Arguimbau filed a libel against the bark Carlotta. It alleges that in November, 1873, the said bark then lying in the port of Tarragona, in Spain, Joaquin Ruis shipped on board of her 750 bags of almonds, each weighing 50 kilogrammes, and marked G. A., and 150 bags of filberts, in good order, and well conditioned, to be transported by said vessel to the port of New York, in like good order and well conditioned, and there delivered to order or assigns, he or they paying freight therefor according to charter party; that the master of said vessel gave a bill of lading therefor, dated November 5th, 1873, which was endorsed over to and held by the libellants, who were the consignees of the cargo therein named, and entitled to demand and receive the same; that in the said month of November, the said bark then lying in the port of Iviza, in Spain, Wallis & Co. shipped in good order and well conditioned, on board of her, to be transported to the port of New York, 425 bags of soft-shelled almonds, of the Fila kind, marked F, weighing gross 22,533 kilogrammes, and also 850 half bags of soft-shelled almonds of the Fila kind, weighing gross 22,533 kilogrammes, and marked G, and also 25 barrels of capers in vinegar, marked 1, and also 25 barrels of capers in vinegar, marked 3, to be carried on board of said bark to the port of New York, and there delivered in like good order and well conditioned, (the acts of God, and all and every other dangers and accidents of the seas and navigation of whatever nature and kind excepted,) unto the libellants or their assigns, they paying freight for the said goods as per charter party dated New York, August 8th, 1873; that the master of said vessel gave a bill of lading therefor, dated November 11th, 1873; that, in the month of December, 1873, the said bark then lying in the port of Malaga, R. M. Gomez shipped in good order and well conditioned, on board of her, 50 quarter casks of wine, marked R M. Gomez, 114 half boxes of oranges, marked R. M. Gomez, 324 quarter boxes of lemons, marked R. M. Gomez, 95 boxes of lemons, marked Jose-

Perez, 157 bags of almonds, marked R. M. Gomez, and 1200 boxes of raisins and 200 frails of raisins, both marked R. M. Gomez, to be delivered in like good order and well conditioned at the port of New York, the dangers of the seas only excepted, unto the libellants or their assigns, they paying freight therefor as per charter; that the master of said vessel gave a bill of lading therefor, dated December 2d, 1873; that in the month of December, 1873, R. M. Gomez shipped in good order and well conditioned on board of said bark, 100 bags of shelled almonds, marked G. A., to be transported on board of said vessel from Malaga aforesaid to the port of New York, and there delivered in like good order and well conditioned, the dangers of the seas only excepted, unto the libellants or their assigns, they paying freight for the same as per charter; that the master of said vessel gave a bill of lading therefor dated December 4th, 1873; that the said bark arrived in the port of New York and the libellants demanded the delivery of said merchandise to them, but the employees of said bark took so little and such bad care, not only in attention to said vessel, but in putting said cargo on board, and in stowing it, and in the care of it while on board, and in landing it in the port of New York, and in the care of it after it was landed, that a large part of it was badly stained by petroleum or some other such substance and also impregnated by the smell arising therefrom, and the bags and contents in which said cargo was delivered were damaged by being eaten by rats, and a large part of said cargo was wholly lost to the libellants or only delivered in a damaged condition, whereby the libellants were damaged to the amount of $2,000 and upwards; and that the libellants are ready to pay said freight upon the proper delivery of said cargo. The libel prays a decree against said bark for said damages.

The answer of the owner of the bark to the last named libel denies all its allegations as to negligence and damage except the allegation that some of the bags were eaten and damaged by rats, and alleges that the libellants were the charterers of the bark under the written charter before mentioned, and that all of the said goods were put on board under said charter, and that the provisions of said charter and of the bills of lading were in all things complied with on behalf of said bark, and any loss or damage or injury to said cargo was caused by perils excepted and without any negligence or fault on the part of said bark.

1. It is set up in the answer in the in personam suit, that many of the bags and packages containing the merchandise, and the contents thereof, were badly eaten by rats or other vermin, and that such injury was the result of want of care on the part of the master and employees of the vessel. In the libel against the vessel the allegation is only of damage by rats to bags and contents of bags, through want of care on the part of the employees of the vessel. On the evidence, a claim is made for loss by rat damage, by the gnawing by rats of holes in some of the bags containing almonds in the shell, and by the eating of some of such almonds by rats, and by the loss of others of such almonds through holes gnawed in such bags by rats. It is contended on the part of the consignees that the vessel is liable for the damage by rats, because there is no exception in the charter-party or the bill of lading which can relieve the vessel from liability for such damage occurring during the voyage; that such damage is not the act of God or a peril of the sea; and that the vessel is liable in the absence of an excepting clause in the contract. For the vessel, it is contended that a carrier is not responsible for damage from natural causes against which he is unable to guard; that it is the natural tendency of rats to gnaw; that the vessel was fumigated before taking in cargo, and had on board a cat and a rat terrier; that nothing more could have been done; and that the rats were probably brought on board in the cargo.

The charter party provides that the vessel shall be in every way fitted for the voyage, and specifies fruit as a contemplated cargo. It contains no other provisions which refer to damage to cargo and no provision as to the giving of bills of lading. It is signed by both of the parties to it. Three of the four bills of lading cover almonds in the shell in bags. One of them specifies 750 bags of soft almonds in the shell, as received on board in good condition, and the master by it promises and undertakes, "God taking me in safety with the said vessel to the said port, to deliver in the same terms." The second specifies 425 bags and 850 half bags of soft-shell almonds as shipped in good order and well conditioned in and upon the vessel, and states that they are to be delivered in the like good order and well conditioned, "the acts of God, the king's enemies, fire, and all and every other dangers and accidents of the seas, rivers and navigation, of whatever nature and kind soever, excepted." The third specifies 157 bags of almonds, as shipped in good order and well conditioned on board the vessel, and states that they are to be delivered in the like good order and well conditioned, "the dangers of the seas only excepted."

In the case of Aymar v. Astor, 6 Cow. 267, the owners of a vessel were sued for damages sustained by the owner of goods shipped on board of it, through the destruction of them by rats. The bill of lading signed by the master stated that the goods were to be delivered in good order and well conditioned, "the dangers of the seas" excepted. At the trial, evidence was given on the question whether the vessel was prudently man-

aged for the avoiding of rats or whether the master had been negligent in that respect. but the court charged the jury that the defendants were common carriers, and liable as such for damage done, unless by the act of God, or the perils of the sea, excepted in the bill of lading, and that damage by rats was not a peril of the sea. On a writ of error the supreme court held that the master of a vessel is not responsible, like a common carrier, for all losses, except they happen by the act of God, or the enemies of the country; and that it ought to have been submitted to the jury, whether the master had used ordinary care and diligence in carrying the goods in question. This exception in favor of a carrier by water is repudiated by the same court in McArthur v. Sears, 21 Wend. 190, and the statement of the exception in Aymar v. Astor is called a "dictum." See, also, Allen v. Sewall, 2 Wend. 327.

In Laveroni v. Drury, 16 Eng. Law & Eq. 510, in 1853, cheese was shipped in a general ship, under bills of lading, whereby the master bound himself to deliver the cheese free from damage, "the act of God, the queen's enemies, fire and all and every other dangers and accidents of the seas, rivers, and navigation," etc., "excepted." The cheese was eaten and damaged by rats, on the voyage. The master had two cats on board, and it was contended by the owners of the vessel that it was for the jury to say whether the keeping of the cats relieved the defendants from the charge of negligence. The court, at the trial, held that the question was not one for the jury, and instructed the jury that damage by rats was not within the exception contained in the bills of lading, and that, if the cheese had been eaten and damaged by rats in the course of the voyage, the defendants were liable. On a motion by the defendants for a new trial the court of exchequer said: "We are of opinion that this direction was right. By the law of England, the master and owner of a general ship are common carriers for hire and responsible as such. This, according to the well-known rule, renders them liable for every damage which occurs during the voyage, except that caused by the act of God and the queen's enemies. They, however, almost universally receive goods under bills of lading signed by the master, and, in such case, the liability depends upon and is governed by the terms of the bill of lading, it being the express contract between the parties—the owner of the goods on the one hand and the master and owner of the ship on the other." As to the exception in the bills of lading, the court said: "The true question is, whether damage by rats falls within this exception, and we are clearly of opinion that it does not. The only part of the exception under which it possibly could be contended to fall, is as a danger or accident of the sea and naviga-

tion; but this, we think, includes only a danger or accident of the sea or navigation properly so called, namely, one caused by the violence of the winds and waves (a vis major) acting upon a seaworthy and substantial ship, and does not cover damage by rats, which is a kind of destruction not peculiar to the sea or navigation, or arising directly from it, but one to which such a commodity as cheese is equally liable in a warehouse on land as in a ship at sea." The court further said, that the only true rule for ascertaining with accuracy and certainty the liability of the master and owner of a general ship is, "that prima facie he is a common carrier, but that his responsibility may be either enlarged or qualified by the terms of the bill of lading, if there be one, and that the question whether the defendant is liable or not, is to be ascertained by the terms of this document, when it exists."

In the case of The Fame [Case No. 4,632], in this court, in 1861, a vessel was libelled to recover for the damages sustained by the loss of part of a cargo of coffee from Rio Janeiro, by the gnawing of the packages by rats, on the voyage. The coffee was carried under a bill of lading which excepted "the dangers and accidents of the seas and navigation." It was set up in defense that the vessel had two cats on board, and that, in view of that fact, the damage by the rats was covered by the exceptions. The court (Shipman, J.) reviewed the authorities and adopted the view that damage by rats was not a peril of the sea, but was damage arising from the negligence of the carrier, and might be prevented by due care, and was within the control of human prudence and sagacity. Independently of that view, the court was of opinion that the master of the vessel had not proved due diligence on his part, because, it being shown that Rio Janeiro was a very bad port for rats, it was not proved that he had fumigated his vessel.

In the case of The Miletus [Case No. 9,545], in the circuit court for this district, in 1866, it was held by Mr. Justice Nelson, "that damages occasioned by vermin, on board of a ship, to a cargo, in the course of a voyage, are not the result of a peril of the sea, or of any of the dangers or accidents of navigation, within an exception to that effect in a bill of lading, but are damages for which the ship and its owner are liable, as insurers of the safe conveyance of the cargo."

In Kay v. Wheeler, L. R. 2 C. P. 302, in 1867, in the exchequer chamber, on error from the common pleas, coffee was shipped under a bill of lading which excepted "the act of God, the queen's enemies, fire, and all and every other dangers and accidents of the seas, rivers and navigation, of what nature and kind soever." The bags were gnawed by rats during the voyage and the contents were partly eaten and damaged by them. The vessel had on board during the

time she was at the place of shipment, and on leaving that place, two cats and two ferrets, and the vessel had before leaving that place been cleared of rats by a professed rat-killer, and every possible precaution was taken to keep rats out of the vessel after that. It was contended for the defendants that the injury by rats was a peril of navigation, because it was a danger which could not be provided against, as it had been shown that the defendants had used every possible means to prevent the injury to the goods. The court held that the question depended on the contract contained in the bill of lading; that the defendants had thereby bound themselves to deliver the goods in the good order and condition in which they were shipped, except in the four cases therein specified; that damage by rats was not within any one of those exceptions; that the defendants had delivered the goods in a very different condition from that in which they received them, and had, therefore, broken their contract; and that the plaintiffs were entitled to recover.

In the recent case of Nugent v. Smith, 1 C. P. Div. 19, it is laid down as the true rule, that "every shipowner or master who carries goods on board his vessel for hire, is, in the absence of express stipulation to the contrary, subject, by implication, by the common law of England, adopting the law of Rome, by reason of his acceptance of the goods to be carried, to the liability of an insurer, except as against the act of God, or the queen's enemies;" and that "it is not only such shipowners as have made themselves in all senses common carriers who are so liable, but all shipowners who carry goods for hire, whether inland, coastwise, or abroad, outward or inward."

In the present case, the shippers having, notwithstanding the charter party, accepted bills of lading for the goods and brought suit thereon, and the owner of the vessel having, notwithstanding the charter party, entered into special contracts, through the master, by means of the bills of lading, in respect to the carriage and delivery of the goods, the bills of lading must be regarded as the contracts by which the rights of the parties are to be governed, so far as respects the matters provided for therein. There is nothing in the bills of lading, in respect to the carriage and delivery of the cargo covered by them, that is inconsistent with anything in the charter party. As regards a contract in a bill of lading for the carriage and delivery of cargo covered by it, it must be regarded as settled by the case of Clark v. Barnwell, 12 How. [53 U. S.] 272, that where a bill of lading admits the shipment of cargo in good order, and binds the carrier to deliver the same in like good order, certain specified damages and accidents excepted, the carrier may be answerable for damage to the goods, although no negligence on his part be shown,

unless he brings the case within a damage or accident so excepted; that, in considering whether the carrier is liable for a particular damage, the question is not whether it happened by reason of the negligence of the persons in the employ of the carrier, but whether it was occasioned by any of those causes which, either according to the general rules of law, or the particular stipulations of the parties, afford an excuse for the non-performance of the contract; and that, after damage to the goods has been established, the burden lies on the carrier, in the case of such a bill of lading, to show that such damage was occasioned by one of the perils from which he was exempted by the bill of lading. This principle is also held in Western Transp. Co. v. Downer, 11 Wall. [78 U. S.] 129. It is the same principle as that decided in Laveroni v. Drury and in Kay v. Wheeler.

In the present case the bills of lading which cover almonds in the shell in bags admit that the goods were received on board in good condition, and undertake that they shall be delivered in like good order. In two of them there are specified exceptions, but loss or damage by rats is not within any of the exceptions specified. It is not an act of God, nor is it a danger or accident of the sea. The definition of the expression "the act of God" is well given in Nugent v. Smith, supra, thus: "The damage or loss in question must have been caused directly and exclusively by such a direct and sudden and violent and irresistible act of nature as the defendant could not, by any amount of ability, foresee would happen, or, if he could foresee that it would happen, could not, by any amount of care and skill, resist, so as to prevent its effect. It lies upon the defendant to show that a damage or loss for which he would otherwise be liable is brought within this exception." It is impossible to say that no human ability could have prevented the presence of rats on the vessel, or could have rid the vessel of rats. It is alleged that the vessel had on board a cat and a rat terrier, and that she was fumigated or smoked in Barcelona before she took on board any cargo. But the cat and the terrier could have been of but little service in catching rats which were down in the hold among the cargo. As to the fumigation, the presence of rats after fumigation must be accepted as evidence that the fumigation was not so thorough and effective as to destroy all rats. The fact that no rats were seen, after the fumigation, until after the vessel left Malaga, and that they were known to be on board after she left Malaga, is not sufficient evidence that they were not on board before the fumigation, or that the fumigation was effective, or that the rats were not on board from Barcelona to Malaga, or that they came on board at Malaga. There is evidence that there were rats on board on the voyage from New York to Bar-

celona, and there is no evidence that the rats came on board in the cargo of fruit. The fact that the vessel was in the stream when she received her cargo at Barcelona and at Iviza, does not go to show that she was free from rats at Barcelona. In a word, it is not shown that the vessel could not, by any amount of care and skill, have been rid of the rats. As to perils of the sea, the eating of almonds by rats, or the gnawing of holes in bags by rats, is not a thing peculiar to the sea or to navigation, or arising directly from navigation, for rats do those things on land as well as in a vessel at sea. I think there is satisfactory evidence that the rats did damage by gnawing holes in the bags. What was the extent of the loss of and damage to bags and almonds by such gnawing is another question.

2. It is claimed that there was damage to the cargo by its contact with petroleum, and by its being impregnated with the odor of petroleum. Full notice is given in the charter party that the vessel was, at the time of the making of the charter party, bound on a voyage from New York to Barcelona, with a cargo of refined petroleum in barrels, and it is provided in the charter party that the homeward cargo may be fruit, and that the vessel is "to be cleaned as customary previous to loading homeward cargo." It is not to be presumed that Gomez & Arguimbau, persons experienced in the trade in question, would have arranged to bring home a cargo of fruit in a vessel which had carried out a cargo of petroleum in barrels, unless they had understood that a cleaning of the vessel in the customary manner, after the discharge of the cargo of petroleum, would have enabled the vessel to bring home the cargo of fruit in good order, free from stains of, or the odor of, petroleum. The evidence is very distinct that the almonds, more or less of them, were found, on their arrival here, to be impregnated with the taste and smell of petroleum, so as to lessen their value, and that such taste and smell came from the petroleum which was in the vessel. There is not, in any of the bills of lading, any exception as to petroleum damage. But the rights of the parties, so far as petroleum damage is concerned, must be governed by the provisions of the charter party as to petroleum. The effect of the provisions of the charter party is, that, the vessel being about to carry out petroleum in barrels, she shall, if "cleaned as customary" before loading the return cargo of fruit, not be liable for damage by petroleum to such return cargo; and that Gomez & Arguimbau, having notice of such carriage of petroleum, take the risk of damage to such return cargo from the petroleum, if the vessel be cleaned in the customary manner before loading such return cargo. Much testimony has been taken as to the manner in which the vessel was cleaned. But the evidence is very clear that vessels which have carried out petroleum in pack-

ages do, after being cleaned in a proper manner, bring back cargoes of such fruit as this vessel had, without the fruit being damaged by having the taste or odor of petroleum. The fact of such damage in the present case must be accepted as evidence that this vessel was not cleaned in the customary or proper manner. The master of this vessel had never carried a cargo of petroleum before, and had never seen a ship cleaned that had carried petroleum, and made inquiries of another master as to the mode of cleaning. It does not alter the case that some or all of the damage may have arisen from the sweat of the hold dropping upon the cargo. The complaint is not that the cargo was damaged by being wet or that it became musty therefrom, but that, whether the water of the sweat was the vehicle or not, the taste and odor of the petroleum were conveyed to and left with the cargo, when that would not have happened if the vessel had been properly cleaned. The sweat and the water thereof would have produced no damage if they had not been conveyers of petroleum taste and odor, and they would not have conveyed such taste and odor if the vessel had been thoroughly cleaned in the proper and customary manner. In Clark v. Barnwell [12 How. (53 U. S.) 272], the damage was mould and mildew caused by the sweat of the hold, a peril of the sea. The libellants in that case failed to show that the damage could have been prevented by the use of proper precautionary measures, or that there had been a neglect of the customary methods of prevention. But in the present case, it is established, I think, that the petroleum damage would not have occurred if the customary and proper mode of cleaning the vessel had been thoroughly used, whether the damage arose from dunnage saturated or impregnated with petroleum, or from the presence of petroleum in the bilge water, or from the conveyance of petroleum or its ingredients by the water of the sweat of the hold.

3. As to all the merchandise that is alleged to have been damaged by rats or petroleum, except the almonds not in the shell, it appears that such merchandise was sold by Gomez & Arguimbau to arrive, for a price based on undamaged goods, and that the purchasers have paid that price in full to Gomez & Arguimbau. The damage alleged in the libel filed by Gomez & Arguimbau is a damage to themselves. It is contended, for the vessel, that they cannot recover any such damage in respect to the merchandise for which they were so paid a sound price, for the reason that they have sustained no damage. While it is true that prima facie the consignee of goods under a bill of lading has the legal title to and a beneficial interest in the goods and may sue the carrier for the non-delivery thereof (Lawrence v. Minturn, 17 How. [58 U. S.] 100; McKinley v. Morrish, 21 How. [62 U. S.] 355), yet such prima

facie right of action may be displaced (Grove v. Brien, 8 How. [49 U. S.] 429; Lawrence v. Minturn, supra). In the present case the goods were the property of Gomez & Arguimbau, when shipped. They sold them to arrive, it is true, but it is not shown that the right of property and the right of possession were not in them when the breach of contract, or neglect of duty, complained of, occurred. The contract of the master in the bills of lading was with Gomez & Arguimbau, or their assigns, and it is not shown that the bills of lading were ever formally assigned or endorsed by Gomez & Arguimbau. I am of opinion, therefore, that Gomez & Arguimbau can maintain the action.

4. If any sum of money has been received either by Gomez & Arguimbau or by any purchaser from them, from the government as a rebate of duties for loss or damage in respect of any goods as to which an allowance shall be found due for loss or damage in the suit brought by Gomez & Arguimbau, they must be charged with such sum.

5. A failure on the part of the vessel to deliver some of the cargo is admitted, the cause of the failure not being due to either rats or petroleum. In the suit brought by the owner of the vessel, there will be a reference to ascertain what cargo was not delivered, and its value, and the reference will cover such goods, if any, as were not delivered because of the action of rats or petroleum, as well as those which, for any other reason, were not delivered. Such value, when ascertained, will be deducted from the amount remaining due on the charter party, and there will be a decree for the remainder.

6. In the suit brought by Gomez & Arguimbau, there will be a reference to ascertain the amount of the damage by rats or the taste or odor of petroleum, to such of the cargo as was delivered.

7. The question as to the costs in both suits is reserved.

[NOTE. On the coming of the commissioner's report, exceptions were filed thereto, and thereafter the parties, other than the vessel, appealed to the circuit court, where the conclusion of the district court as to the exceptions was sustained. See Cases Nos. 2,413a and 2,413b.

[Losses by perils of the sea include only such as are of an extraordinary nature, or arise from irresistible force or from inevitable accidents, or from some overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence. The Northern Belle, Case No. 10,319, affirmed in The Northern Belle v. Robson, 9 Wall. (76 U. S.) 526. Damage to a cargo by rats is not a peril of the sea, or a danger of navigation, within those terms in a bill of lading, unless it be shown that ordinary care and diligence were used to guard against injury by rats; citing Kirkland v. The Fame, Case No. 7,845; The Isabella, Id. 7,099. Nor are damages to a cargo by cockroaches, in the course of a voyage, the result of a peril of the sea, or any of the dangers or accidents of navigation; citing Hazard v. New England Marine Ins. Co., 8 Pet. (33 U. S.) 557; The Miletus, Case No. 9,545.]