CHURCH COOPERAGE CO. et al. v. PINKNEY et al.

(Circuit Court of Appeals, Second Circuit. April 13, 1909.)

No. 213.

1. SHIPPING (§ 42*)—CHARTERS—FITNESS OF VESSEL.
A ship which is fit for the carrying of an article is one which will carry such article without injury, and the liability of a shipowner for breach of a warranty of fitness is not limited to such injury to the cargo as is apparent before its delivery, but extends to a latent injury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 158; Dec. Dig. § 42.*]

2. SHIPPING (§ 42*)—CHARTERS—INJURY TO CARGO.
A warranty of the fitness of a vessel chartered to carry a cargo of whisky barrel shooks known by the owner to be intended for use in making wine casks, whether express or implied, rendered the owner liable for injury to the shooks by being so impregnated by creosote fumes that they were unfit for use, due to the fact that the vessel had last carried a cargo of creosote, in the absence of any stipulation in the charter against such liability.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 158; Dec. Dig. § 42.*

Implied warranty of seaworthiness, see notes to The Carib Prince, 15 C. C. A. 388; Neilson v. Coal, Cement & Supply Co.. 60 C. C. A. 179.]

3. SHIPPING (§ 42*)—CHARTERS—CONSTRUCTION—WARRANTY OF FITNESS.
A charter of a vessel to carry a cargo of whisky barrel shooks and heads contained a general warranty of fitness for the voyage. It also recited that the vessel was then on a voyage with a cargo of creosote, and provided that "vessel agrees to have holds as clean as possible." Held, that such provision did not limit or modify the absolute warranty of fitness, but was an additional requirement to prevent injury owing to the known character of the preceding cargo, and that the fact that such cleaning was done did not abridge the right of the charterer to recover for damage done to the cargo by creosote fumes which the cleaning failed to prevent.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 158; Dec. Dig. § 42.*]

4. SHIPPING (§ 42*)—CHARTERS—WARRANTY OF FITNESS—WAIVER.
The fact that the cleaning was done under direction of the charterer's agent and to his satisfaction, and that he thereafter accepted and loaded the vessel and refused to cancel the charter as offered by the owners, did not constitute a waiver of the fitness, nor did a release given by the charterer on payment of a small sum for damage which was known when the cargo arrived, the damage from the creosote fumes not being known until some of the casks had been made up and found unfit for the use intended.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 42.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. APPEAL AND ERROR (§ 722*)—ASSIGNMENT OF ERRORS—FORM—DESIGNATION
   OF COURT.
    An assignment of errors filed in a District Court for an appeal should
bear the title of that court and not of the Circuit Court of Appeals, but
such informality will not invalidate the appeal.
    [Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 722.*]

Appeal from the District Court of the United States for the Southern District of New York.

For opinion below, see 163 Fed. 653.

J. Parker Kirlin and Charles R. Hickox, for appellants.

Wing, Putnam & Burlingham and Harrington Putnam, for appellees.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

NOYES, Circuit Judge. On February 15, 1906, the libelants, through their agent, the Gulf Cooperage Company, chartered the bark Alexandra from the respondents, as chartered owners thereof, for a voyage from Galveston, Tex., to Buenos Ayres, Argentina.

The charter party stated that the bark was then sailing from Glasgow to Port Arthur, Tex., with a cargo of creosote, and contained the following provisions, which are of especial importance in this case:

    (a) "The said vessel shall be tight, staunch, strong, and in every way fitted for such a voyage. * * * The said party of the second part doth engage to provide and furnish to the said vessel, a full and complete cargo of * * * not exceeding forty thousand (40,000) whisky barrel shooks and heads in bundles, and two hundred and sixty-five (265) net tons hoop iron, packed flat in bundles * * *."

    (b) "Captain to open hatches whenever practicable during the voyage to ventilate cargo."

    (c) "Vessel agrees to have holds as clean as possible."

The charter party from the owners of the bark to the respondents was similar in its provisions to the charter in question, except that it did not contain the preliminary recital that the bark was carrying creosote, and had the following clause:

    "Captain to clean holds before loading as much as possible, but charterers must risk consequences of ship having carried creosote."

After the bark arrived at Port Arthur she proceeded to Galveston, where her holds were made as clean as possible under the superintendence of the libelants' agent, one Thompson. She was then loaded with her cargo of shooks and hoop iron, and in April, 1906, proceeded upon the voyage to Buenos Ayres. She reached there in about 70 days and discharged the cargo in apparent good order, except that a few bundles of shooks were stained. For this damage a settlement was made by deducting $100 from the freight, and a receipt given by the libelants through their agent "in full settlement of our claim for damages to cargo delivered in bad condition." After delivery, some of the shooks were sold and made into wine casks. The wine put into these casks tasted of creosote, and they proved to be unfit for holding wine and practicably unsalable for any other purpose.

---

' For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

As just shown, the staves are described in the charter as "whisky barrel shooks." This phrase, we think, designates a particular size and quality of staves, rather than the intended contents of the barrels to be made therefrom. We are also of the opinion that the weight of evidence establishes that the respondents, when they undertook to obtain a ship for the libelants, were informed that the staves were to be shipped to supply the wine trade. The testimony of the witness Winant that at the outset of the negotiations for a ship the parties talked over the wine shook business in the Argentine Republic—in which these libelants proposed to engage—seems to us wholly in accordance with probability. Moreover, we are satisfied that the staves, by reason 'of the creosote impregnation, would have been unfit for making barrels designed to contain whisky or any other alcoholic drinkable.

It thus appears that the libelants had a charter party expressly warranting the fitness of the vessel for carrying the staves. A similar warranty was also implied by law. A ship is impliedly warranted to be fit for carrying the merchandise which she undertakes to transport. The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65; The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; The Thames, 61 Fed. 1014, 10 C. C. A. 232; Tattersal v. National S. S. Co., 12 Q. B. D. 297. It also appears that the staves were damaged by reason of the condition of the vessel. Consequently, the inquiries of primary importance in the case are: (1) Was the warranty, express or implied, broad enough to cover damage from creosote fumes? (2) Was the warranty modified by the other provisions of the charter? (3) Did the libelants waive or release their rights under the warranty?

The staves when taken from the bark were in apparent good order. It was only when the casks from which they were made were filled with wine and the wine was tasted that the damage was disclosed. The alcohol in the wine drew out the creosote taint. At first glance, it seems harsh to hold the carrier liable for damage of this nature. It seems a somewhat remote consequence of the conveyance of the staves. And yet the vessel was warranted fit for the purpose of carrying the staves. A ship fit for the purpose of carrying an article is a ship which will carry the article without injury to it. This ship did not carry these staves without injury to them. On the contrary, they were impregnated with creosote fumes while in her hold. The damage was the direct result of the unfitness of the vessel, and the warranties covered it, notwithstanding the injury was not disclosed until after the staves had been removed from the bark and used for their intended purpose. Neither principle nor authority supports the proposition that the warranty of fitness, express or implied, affords protection to the owner of the cargo only for injuries apparent before its delivery.

And, with respect to the contention that a warranty of fitness should not be so broadly construed as to apply when damages arise under unusual conditions to a cargo susceptible of serious injury from apparently slight causes, the language of Judge Blatchford in The Lizzie W. Virden (C. C.) 19 Blatchf. 340, 8 Fed. 624, is in point. In that case a ship which had carried petroleum took on a cargo of al-

monds, which was injured by the petroleum odor remaining in the vessel. The court said:

"The answer to any evidence in this case that cargo like this must be damaged if carried on a vessel which has previously had in her a cargo of petroleum which has leaked, provided there is heat and sweat in the hold, is that in this case the risk was not on the shipper. If the petroleum leaks out, and if the wood forming the vessel will absorb it, then, if heat and sweat in the holds are necessary incidents of the voyage, the shipowner must protect himself by proper provisions if he does not wish to be liable for damage caused by the liberation of the fumes of petroleum by the heat of the hold. His contract in this case was to provide a vessel fit to carry this cargo. She was not fit. The shipper took no risks but the perils of the sea, and the damage in this case was not a peril of the sea."

The next inquiry is whether the warranty of fitness was modified by the clause in the charter party: "Vessel agrees to have holds as clean as possible." As we have seen, the vessel was both expressly and impliedly warranted fit. The staves were damaged by creosote fumes while upon the vessel. The damage came within none of the exceptions of the charter party. There was no stipulation—as in the charter which the respondents themselves took—that "charterers must risk consequences of ship having carried creosote." The warranties of absolute fitness are to be cut down, if at all, by the clause providing for cleaning the holds. The respondents contend that the clause has this effect: that by it the respondents' contract was changed from a warranty to an undertaking to use every possible care to clean the hold of the vessel from the creosote taint. In considering this contention of the respondents, it must be borne in mind that "clauses exempting the owner from the general obligation of furnishing a seaworthy vessel must be confined within strict limits." The Carib Prince, 170 U. S. 659, 18 Sup. Ct. 753, 42 L. Ed. 1181. Also The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644; Steel v. State Line Steamship Co., L. R. 3 App. Cas. 72. And certainly no such interpretation should be placed upon a charter party as to hold that a clause apparently imposing an additional burden upon the shipowner really lessens his liability; that, having given a warranty of the absolute fitness of the vessel, the respondents could wholly escape liability thereon by agreeing to clean its holds. Any such result should follow from the use of definite and certain language, and not arise by way of uncertain implication from possibly inconsistent provisions. Moreover, the provision for cleaning the holds is not inconsistent with the warranty; nor is it necessary to narrow the warranty to give it meaning. It may be true that, as a matter of law, a warranty of absolute fitness in case of loss is not added to by an agreement to clean the vessel. As stated by the District Judge:

"If the ship, after fulfilling her engagement of unusual cleanliness, is still held to a complete absence of creosote odor, then the meaning of the charter party would be exactly the same with or without a sentence obviously inserted solely on account of the known cargo and its known characteristics."

But while, from a strictly legal point of view, this may be correct, we think the clause practically can be given a meaning as an addition to the warranty. While the respondents were liable under their warranty for damage from creosote, it may well be that both parties de-

sired to eliminate the possibility of damages occurring and giving rise to suits to enforce legal liability. The clause providing for cleaning the holds insured certain acts upon the part of the respondents which they otherwise might not have taken. In addition to the warranty of fitness which afforded compensation after damage took place, this clause insured a cleansing process which might have prevented the damage from taking place. A provision in a contract requiring precautions to prevent injury is not meaningless, even though other provisions insure compensation in case of injury. The clause in question was inserted in the charter party by the respondents. They did not adopt the language of their own charter, which would have made the matter clear beyond question. The clause which they inserted is not inconsistent with the warranty, and we are of the opinion that it should not be construed to abridge the right of the libelants to have a vessel fit for their cargo.

In reaching this conclusion, we are not unmindful of the case of The Carlotta, 9 Ben. 1, Fed. Cas. No. 2,413, decided by Judge Blatchford in 1877. In that case it is true that it was held that a provision in the charter of a vessel carrying petroleum, that she should be "cleaned as customary" before taking on a return cargo of fruit, rendered her not liable for injuries to such cargo; the cleaning being established. But this particular point did not receive extended consideration, and in so far as the case may hold that the effect of a mere cleaning clause is to prevent the operation of a warranty we think, for reasons already stated, that it is contrary to sound principle.

The remaining inquiry is whether the libelants released or waived their rights under the warranty. With respect to the release executed at Buenos Ayres after the Alexandra arrived and certain items of damage were apparent, we fully agree with the holding of the District Judge:

"The release does not, in my opinion, cover the claim in suit, which is not for breakage, rust, or stains even of creosote, but for the loss of practically the entire cargo of wine casks, as receptacles for wine, because of an impregnation by creosote odor, undiscovered and unsuspected when the claim was advanced for which the release was executed."

Finally, the respondents claim that the libelants waived their rights under the warranty by accepting the vessel after the cleaning process at Galveston, and by not agreeing to the cancellation of the charter when the respondents proposed that course. We have no doubt that Thompson was the libelants' agent at Galveston, and that the vessel was cleaned under his directions and was accepted by him. But by none of these acts did the libelants waive the warranty of fitness. As already shown, the agreement to clean the holds had a meaning distinct from the warranty, and any acceptance by Thompson was a waiver only of further performance under that agreement. Undoubtedly Thompson thought the vessel fit to receive her cargo, but there is nothing to show that he undertook to release the respondents from their warranty that she was so. After the vessel was cleaned— even under Thompson's directions—the risk of her being fit was still upon the respondents as chartered owners, and Thompson's action in permitting her to be loaded did not operate to release them from the

risk of latent unfitness. If Thompson had prevented the respondents from taking steps which they thought necessary to thoroughly clean and prepare the vessel for her cargo, there might be ground for claiming that the libelants became estopped to insist upon a breach of warranty. But Thompson compelled the ship to do more than her master desired, and anything less than an agreement to waive the warranty would have failed to have that effect.

Neither does any principle of estoppel arise in the respondents' favor by the failure of the libelants to accept their offer to cancel the charter. No claim is made that the charter party was obtained by misrepresentations. The respondents made their contract and were bound to carry it out. Their offer to cancel it imposed no obligation upon the libelants. No element of estoppel was present.

For these reasons, we think that the libelants have a valid demand upon the respondents upon their warranty. It is a hard case, but the cargo was seriously damaged, and the loss must fall somewhere. The chartered owners, not the charterers, under the charter party took the risk of the damage which occurred. They could have protected themselves by employing the same provisions which appeared in the charter which they themselves took. They failed to do so, and entered into one of the broadest possible contracts—that of warrantors of the fitness of a vessel. They must bear the burden of that contract.

The assignment of errors filed in the District Court in this case bore the title of this court. This was incorrect. The title should have been that of the District Court—the court in which the paper was filed. But this informality did not invalidate the appeal.

The decree of the District Court is reversed with costs, and the cause is remanded with instructions to enter a decree for the libelants for their damages—to be ascertained in the usual way—and costs.