SAMINCORP, South American Minerals and Merchandise Corporation, Libellant,

v.

S. S. RIVADELUNA, her engines, boilers, etc. and Angel Riva Suardiaz, her owner, Claimant-Respondent.

No. 1799.

United States District Court
D. Delaware.
Nov. 17, 1967.

Edmund D. Lyons, of Morris, James, Hitchens & Williams, Wilmington, Del., and John W. R. Zisgen, of Bingham, Englar, Jones & Houston, New York City, for libellant.

Ernest S. Wilson, of Wilson & Lynam, Wilmington, Del., and Raul Betancourt, Jr., and Richard W. Palmer, of Rawle & Henderson, Philadelphia, Pa., for claimant-respondent.

## OPINION

STEEL, District Judge.

This action involves the liability of a vessel and its owner to the owner of cargo for alleged damage to the cargo which is asserted to have occurred while the cargo was being transported by the vessel under a charter party between the cargo owner's agent and the vessel owner.

Libellant Samincorp, South American Minerals and Merchandise Corporation, is a New York corporation. SS "Rivadeluna" is, or was, a Spanish merchant vessel, owned and operated by respondent, Angel Riva Suardiaz, a citizen and resident of Spain. The Rivadeluna was within the District of Delaware when the libel was filed. She was attached and then released by reason of prior security arrangements between the parties.

The suit is in admiralty *in rem* and *in personam*. The cargo consisted of approximately 5,000 tons of fluorspar, shipped on the Rivadeluna at Aviles, Spain on September 27, 1959 to Wilmington, Delaware, where, according to Samincorp, the cargo was found contaminated by coal. It is Samincorp's claim that the contamination occurred during the voyage. Samincorp was the owner of the fluorspar during the voyage.

Jurisdiction exists under Article III, Section 2, of the Constitution of the United States of America and 28 U.S.C. § 1333(1).

On April 7, 1959, Samincorp contracted to buy the fluorspar from Minerals &

Chemicals, Ltd. of Montreal at a price of about $27 per dry short ton, FOB Aviles, loaded, trimmed and stowed. The fluorspar had been mined by Minerales y Productos Derivados S.A. ("Minersa") which owned mines on the northern coast of Spain. Successively, Minersa sold the fluorspar to Hispano Industrial y Comercial Minera, S.A., ("Minispan"); Minispan contracted to sell it to Aceros Atlas, S.A. (an importer and manufacturer of steel); Aceros Atlas contracted to sell it to Minerals & Chemicals, Ltd. of Montreal; and the latter on April 7, 1959 contracted to sell it to Samincorp. Each of the sales contracts, beginning with that between Minersa and Minispan and concluding with that between Minerals & Chemicals and Samincorp, provided that the sale should be "FOB Aviles, loaded, stowed and trimmed." [1]

On August 24, 1959, Samincorp contracted to sell to St. Lawrence Fluorspar, Inc. 5,000 dry short tons in bulk of acid grade filtercake fluorspar, minimum guaranteed Ca $F_2$ of 97.01 per cent according to specification attached to the contract [2] at $36.425 per dry short ton, CIF Wilmington, Delaware, duty paid, unloading for buyer's account, the shipment to be from Spain during September/October 1959.

On September 4, 1959 Samincorp entered into a charter party with the respondent for the transportation of the fluorspar on the vessel Rivadeluna from Aviles to Wilmington. [3]

The charter party was on a printed form which contained certain insertions and deletions made by the parties. Paragraph 2 provided:

"That the said Ship being warranted tight, staunch, and strong, and in every way fitted for the voyage * * "

This clause imposed upon the respondent, as charterer, the obligation to see that the vessel was seaworthy and suitable for the service for which she was to be employed. The Edwin I. Morrison, 153 U.S. 199, 210, 14 S.Ct. 823, 38 L.Ed. 688 (1894).

The charter party had attached to the printed form "additional clauses" which had been specially prepared by the parties. [4] Paragraph 30 stated that, "Cargo holds are to be cleaned and swept suitable for fluorspar cargo." [5] Even if

---

1. Actually the contract between Minersa and Minispan was for delivery "FOB a Cantabrian port, loaded, stowed and trimmed." The port subsequently designated was Aviles, a Cantabrian port.

2. The specifications are not relevant to the instant action.

3. The charter party provided for transportation to the "Eastern Seaboard of Canada, port to be designated 24 hours after sailing". The port designated was Wilmington, Delaware. No point has been made by anyone about Wilmington not being on the eastern seaboard of Canada.

4. The "additional clauses" attached to the charter include "U.S.A. clause paramount" which reads:
   "U. S. A. CLAUSE PARAMOUNT: 'This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its

responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.' "
   The parties are in disagreement whether this made the Carriage of Goods by Sea Act, 46 U.S.C. § 1301 et seq., a part of the charter party or simply incorporated the Act into the bill of lading. 46 U.S.C. § 1303 provides in subparagraph 1:
   "The carrier shall be bound before and at the beginning of the voyage, to exercise due diligence to—
   *       *       *       *       *
   (c) Make the holds * * * and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation."
   It is not necessary to resolve the question whether the above provision was part of the charter party. Samincorp, which argues the affirmative, concedes that the effect of the above statutory paragraph is about the same as paragraph 30 of the charter party.

5. Both of the parties agree that this was an obligation imposed upon the vessel.

this obligation to clean were to be construed to be limited to "holds", it did not effect the charter's warranty of seaworthiness of the entire vessel. Church Cooperage Co. v. Pinkney, 170 F. 266 (2d Cir. 1909), cert. denied, 214 U.S. 526, 29 S.Ct. 704, 53 L.Ed. 1068. If a vessel is not reasonably fit to carry the cargo which she has undertaken to transport, she is not seaworthy. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241 (1898).

Samincorp asserts that respondent breached the charter party (paragraphs 2 and 30) and that as a result the fluorspar became contaminated with coal during the voyage which rendered it unacceptable for commercial usage. This is denied by respondent. Respondent also argues that Samincorp has waived any claim that it might otherwise have concerning the insufficiency of the cleaning of the vessel, and is estopped to make such a contention because Alvargonzales, whom respondent claims to have been Samincorp's agent, loaded, trimmed and stowed the vessel, and before doing so approved the vessel's condition. As an additional defense respondent also claims exemption from liability under the "Danger and Accidents of the Sea" provision of paragraph 20 of the charter party, arguing that if commercially prejudicial contamination occurred during the voyage it was due to the abnormal motion of the vessel during the storm which it encountered.[6]

Prior to proceeding to Aviles to pick up the cargo of fluorspar, the Rivadeluna had been loaded with 7,446 tons of coal in bulk at Newport News, Virginia, for transportation to Aviles. This was all of the coal that she could carry. The coal had been stowed in all four holds and in all four tween decks. During the voyage the hatch beams and hatch covers separating the tween decks from the lower holds were not in place but had been set to one side, tied together, in each of the tween decks. They had been held in place in the tween decks by the stow of coal. The discharge of coal cargo at Aviles was completed on September 23, 1959.

For several weeks prior to the time when the fluorspar was loaded on the Rivadeluna, the cargo had been stored in the open at the loading berth and had been covered with tarpaulins. During the four days which were consumed in loading, the tarpaulins were removed and the fluorspar was exposed to the wind and weather. On each side of the fluorspar there were uncovered piles of coal. At the same time as the fluorspar was being loaded, gondola cars carrying coal passed back and forth on railroad tracks between the fluorspar and the side of the Rivadeluna, and coal vessels were also being loaded in the area.

Before leaving the coal discharge berth to load the fluorspar, the Rivadeluna crew swept and washed down the cargo holds. Alvargonzales, the stevedoring firm which loaded, stowed and trimmed the fluorspar, furnished additional men who cleaned the vessel's tween decks.

After the cleaning had been completed, Enrique Alvargonzales and Heinz Schwartz, partners in the firm of Romualdo Alvargonzales, and Jose Duran, an engineer and surveyor in the employ of Minersa from whom the fluorspar had originated, inspected the vessel's holds to determine if the vessel was ready for loading. After doing so they found her cargo compartments clean and suitable for the transportation of the fluorspar, and accepted the vessel as ready to load.

■ Respondent argues that the loading and inspection of the vessel and its acceptance by Alvargonzales, whom respondent claims was acting as agent for Samincorp, estops Samincorp from claiming that any coal in the vessel damaged the cargo. Samincorp denies that Alvargonzales was agent for it in the respects indicated. The burden of sustaining this estoppel is on the respondent. It has failed to meet that burden.

6. The parties agree that this storm was a "peril of the sea".

Alvargonzales did act on Samincorp's behalf in certain particulars: under the charter party the vessel had to apply to Alvargonzales for cargo; Alvargonzales made arrangements that saved time in loading and earned dispatch money for Samincorp; and Alvargonzales signed the time sheets "for the charters". But no evidence exists that Samincorp intended or employed Alvargonzales to represent it in loading and inspecting the vessel, nor is there evidence that Alvargonzales represented that he had any such authority.

No reason exists why Samincorp should have assumed the burden of loading the fluorspar, through an agent or otherwise, when under its contract of purchase with Minerals & Chemicals, Ltd. Samincorp brought the fluorspar "FOB vessel, N. Spanish port, loaded, trimmed and stowed." Under the terms of the prior contracts of purchase the ultimate obligation was on the producer, Minersa, to load, stow and trim the fluorspar on the vessel. It was Minersa which engaged Alvargonzales to do the stevedoring and it paid Alvargonzales for its services.[7]

For about two and one half hours a clamshell bucket was used to load the fluorspar into either hold number 3 or number 4. Alternately the bucket was used to load coal into a vessel in the berth forward and adjacent to the Rivadeluna's bow. The master of the Rivadeluna protested this dual use of the bucket, and the practice was thereupon discontinued.

When the loading was completed, Enrique Alvargonzales, Schwartz and Duran presented the Master with a bill of lading for his signature. Since the bill of lading, if signed, would constitute an acknowledgement by the Master of receipt of the fluorspar "in apparent good condition", the Master questioned the dark and dirty appearance of the fluorspar and indicated his desire to take exception to the statement in the bill of lading that the fluorspar was in apparent good condition. Messrs. Alvargonzales and Schwartz convinced him that the appearance of the fluorspar was normal even though there might be some "fungus" in it, pointed out that damage to the fluorspar could result only from salt water, and that the bill of lading expressly provided, "weight, measure, quality, condition, contents and value unknown." With this assurance the Master signed the bill of lading and returned it to the representatives of Alvargonzales on whose form it was prepared.

During the ocean voyage the Rivadeluna encountered storms and heavy weather on October 10, 1959, with wind forces reaching force 10–11 on the Beaufort scale; i. e. between 46 and 66 knots. During the storm the Rivadeluna lost the canvas covers on her ventilators. The storms and weather amounted to a sea peril.

The Rivadeluna arrived in Wilmington and began to discharge at 0800 on Thursday, October 15. The discharge work was done by the stevedoring firm of St. Lawrence Shipping, Inc., which Samincorp employed. Discharge was completed at 1545 on October 19, 1959, and the Rivadeluna sailed at 1640. On October 19, 1959 Samincorp rejected the fluorspar because of alleged coal contamination. St. Lawrence Fluorspar, the intended purchaser, advised Samincorp of its intent to reject the cargo at about this time.

It is not disputed that there was some coal in the fluorspar immediately prior to loading at Aviles, and in the undisturbed stow of the fluorspar upon arrival at Wilmington. Respondent contends that there was no significant difference in the quantity of coal upon loading and upon arrival, and that in any event if there was some increase during the voyage, the amount was not sufficient to justify the rejection of the fluorspar as below commercial standards.

---

7. Since Alvargonzales was not the agent of Samincorp, it is unnecessary to determine the legal question whether approval by Alvargonzales of the condition of the vessel before loading estopped Samincorp from claiming that the vessel was inadequately cleaned. See discussion of the question in Church Cooperage Co. v. Pinkney, supra.

A critical question is whether the fluorspar upon its arrival in Wilmington was commercially substandard, and whether this condition had antedated its carriage by the Rivadeluna, or had been caused by its exposure to coal during the voyage upon the vessel.

While the contract between Samincorp and St. Lawrence Fluorspar, Inc. contained certain specifications which the fluorspar was required to meet, it was silent as to the permissible coal or carbon content. The evidence, however, establishes that if coal can be kept under .03 per cent, the fluorspar is acceptable for commercial purposes.

Tests were made upon pre-shipment samples of the fluorspar taken at Aviles to ascertain its coal content. Pitkin & Co., acting for Samincorp found .034 per cent coal. McCreath & Co., acting for respondent, found .004 per cent coal. Booth, Garrett & Blair, the umpire between Samincorp and its vendor, Minerals & Chemicals, found some coal by visual analysis.

Samples taken at Wilmington from undisturbed stow in holds 2, 3 and 4 were likewise analyzed by each of these three firms.[8] Pitkin & Co. tested two samples and concluded that they contained .23 per cent coal. This conclusion rested upon two assumptions: (1) that all of the carbon was coal, and (2) that the coal had 80 per cent carbon content. Both assumptions appear reasonable in the light of the evidence.

A number of tests were run by McCreath. It found .004 per cent coal in the sample. This is the same percentage found in the pre-shipment samples and would satisfy the standard of commercial acceptability. Krecker, a vice president, who testified on behalf of McCreath, did none of the work himself. He never saw the samples as far as he could remember. He knew little more about the work and the results than what the certificates issued by McCreath disclosed. He did not know what the statements in some of the certificates meant. The certificates were based upon notes which were no longer in existence. The intra-laboratory reports which still existed were not produced nor was their non-production explained. For these reasons the McCreath tests are entitled to little weight.

Booth, Garrett & Blair found from a visual examination of the post-shipment samples that they contained more coal than was observed in the pre-shipment samples.

The Snell Laboratories also made an analysis for Samincorp of samples of undisturbed stow from holds, 2, 3 and 4; it is not clear if Snell, unlike the other laboratories, received and tested a sample from hold number 1. Under a 12 power microscope it found some black lumps in the fluorspar. When these evaporated at 100 degrees centigrade, Snell concluded that the samples contained no coal. Only a small part of the sample was tested. In light of the analyses done by the other three assayers, all of which found some coal in the fluorspar, the Snell test, finding no coal at all, is not acceptable.

■ The conclusion is warranted that the fluorspar at the time of loading contained some coal and was marginal as to commercial acceptability. Upon arrival in Wilmington the fluorspar contained enough coal to make it substantially substandard from a commercial standpoint.

The additional coal which the fluorspar contained upon arrival in Wilmington had been intermixed with the fluorspar during the Rivadeluna voyage as a result of the failure of the respondent to clean and sweep the vessel so as to render it suitable for its intended cargo. The testimony leaves little doubt that substantial quantities of coal had adhered to the hatch beams in the tween decks prior to the departure of the Rivadeluna from Aviles. This failure on the part of the respondent to adequately clean and

8. By the time that samples were taken there was little stow remaining in hold No. 1 and what was left had been so disturbed in unloading as to make an analysis of it of little value. Some coal, or coal dust, was, however, observed in the hold.

sweep the vessel constituted a breach of its obligation under the charter party (paragraphs 2 and 30) and rendered respondent liable to Samincorp for the damages which the latter sustained.

█ The fact that the storm which the Rivadeluna encountered may have increased the hazard of contamination (there is no direct evidence that it did) is irrelevant. Since the damage resulting from the storm would not have occurred had the vessel been properly fitted to carry the fluorspar, the storm is no defense. Norris Grain Co. v. Great Lakes Transit Corp., 70 F.2d 32 (7th Cir. 1934) cert. denied, 293 U.S. 565, 55 S.Ct. 75, 79 L.Ed. 664.

█ The measure of Samincorp's damage is the difference between the price at which it contracted to sell the fluorspar to St. Lawrence Fluorspar, Inc. (that being less than the fair market value of commercially acceptable fluorspar), and the fair market value of the fluorspar in the condition in which the Rivadeluna cargo was received. There is no dispute about the fact that the cargo consisted of 4,768.1165 short dry tons, and that if the cargo had not been contaminated St. Lawrence Fluorspar, Inc. would have paid Samincorp $171,-911.85 under the contract between them. The parties are, however, in sharp disagreement concerning the fair market value of the fluorspar in its contaminated condition.

Samincorp contends that this value was $12.50 per short dry ton or a total of $59,601.46. It points out that after the fluorspar had been rejected, the parties agreed that Shepard of Samincorp would contact companies in the hydrofluoric acid industry to ascertain what they would pay for the contaminated fluorspar, and that Hanley and Davies, the respective surveyors for Samincorp and respondent, would make a similar approach to glass manufacturers. These two industries were the only potential purchasers of acid grade fluorspar. The glass companies which were approached

showed no interest. General Chemical Corporation made an offer, subject to several undesirable contingencies, which would in effect have netted $11.62 per ton to Samincorp. On March 25, 1960, Seibert, Jr., president of St. Lawrence Fluorspar, Inc., made an offer of $12.00 per short dry ton FOB Wilmington. Neither the General Chemical nor the St. Lawrence Fluorspar offer was accepted.

Instead, Samincorp itself "purchased" the fluorspar for $12.50 per ton, or a total of $59,601.46. The precise explanation of this "purchase" is not revealed by the record with the clarity that might be wished for. It appears to have come about as a result of a settlement between Samincorp and British and Foreign Marine Insurance Co., Ltd., its insurance underwriter, under which Samincorp was paid $195,601.45.[9] Of this amount Samincorp received $136,000 in cash and $59,601.46 by the retention of the fluorspar at $12.50 per ton—a valuation agreed to by Samincorp and the underwriter. The only evidence of the time when the agreement between Samincorp and its underwriter was entered into is the dates of the checks which Samincorp received, i. e., March 17 and April 4, 1960.

Samincorp claims that the price of $12.50 per ton at which it retained the fluorspar was the best price obtainable after diligent efforts to find a buyer had been made, and hence represents the fair market value of the fluorspar in its contaminated condition. Subsequent events disprove this.

On June 3, 1960, St. Lawrence Fluorspar which on March 25, 1960 had offered $12 per short dry ton for the cargo, purchased it from Samincorp for $25.524 per short dry ton "where is, as is" Wilmington, Delaware, with a credit of $1,-766.79 for an adjustment of ocean freight rate. The total net purchase price amounted to $119,462.57, in addition to which St. Lawrence Fluorspar, Inc. waived certain accrued charges of $9,-188.91 for which Samincorp was liable

---

9. How this amount of damages was calculated is not apparent from the record.

to it. The total benefit which Samincorp received was therefore $128,651.48. It is respondent's contention that this represents the fair market value of the contaminated fluorspar at the time of its discharge.

Samincorp argues that the price at which it sold the fluorspar to St. Lawrence Fluorspar is irrelevant. It asserts that if it had been compelled to sell the fluorspar for less than $12.50 per ton, which it "paid", it would not be able to recover the loss as part of its damages, and that by the same reasoning any profit which it made should not serve to limit its recovery.

Samincorp's argument is unacceptable. The transaction between Samincorp and St. Lawrence Fluorspar is evidence of market value of the fluorspar at the date of its discharge. The evidence is uncontradicted that the market value of fluorspar had not changed from between October of 1959 and June of 1960. Negotiations between Samincorp and St. Lawrence Fluorspar, eventuating in the June 3, 1960 agreement, were begun in May. Why St. Lawrence Fluorspar was willing to pay twice as much as it had offered only two months earlier stands unexplained.

What St. Lawrence Fluorspar did after making the purchase was to blend Rivadeluna cargo with uncontaminated fluorspar. Seibert, Jr., president of the company, testified that the processing of fluorspar customarily included blending, among other things; and that after it acquired the Rivadeluna cargo it processed the cargo in the usual manner, including blending, with some quality control beyond that normally exercised. He estimated that the additional cost of

processing the Rivadeluna cargo was about $2.00 a ton over the cost of the usual processing. He said that there was no reason why his company could not have processed the Rivadeluna cargo after its discharge in October 1959 just as it did following its purchase in June 1960.

After the processing of the Rivadeluna cargo had been completed St. Lawrence Fluorspar sold the fluorspar to its normal customers, including DuPont, at approximately $48—$50 per dry short ton. DuPont's primary use for fluorspar was to manufacture hydrofluoric acid. It made no complaint about the fluorspar.

Shepard never satisfactorily explained how he, as a graduate chemist and an experienced importer of fluorspar, only came to realize in May 1960 that the Rivadeluna cargo could by blending be rendered commercially acceptable by St. Lawrence Fluorspar. Courtney, Sullivan Associates, Inc., surveyors for Samincorp and its underwriter, had mentioned the possibility of blending in a report to the underwriter in January 1960.

■ As previously stated, the total benefit which Samincorp received under its contract of June 3, 1960 with St. Lawrence Fluorspar was $128,651.48. The difference between this figure and the $171,911.85 which it was entitled to receive under its original contract of August 24, 1959 with St. Lawrence Fluorspar amounts to $43,260.37. This is the damage which Samincorp sustained as a result of the breach by respondent of paragraphs 2 and 30 of the charter party.

The foregoing constitutes findings of fact and conclusions of law under Fed. R.Civ.P. 52.