## THE MACKINAW.

(District Court, D. Oregon. November 23, 1908.)

### No. 4,976.

ADMIRALTY (§ 20*)—JURISDICTION—MARITIME TORT—"LAND."

    A pontoon floating upon the water of a navigable stream, between high and low water mark, rising and falling with the tide and used as a landing in connection with a ferry, although fastened to the shore by a cable is not land, and an action for an injury to a person thereon by a moving vessel is for a maritime tort and within the admiralty jurisdiction.

    [Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 216; Dec. Dig. § 20.*

    For other definitions, see Words and Phrases, vol. 5, pp. 3975–3984; vol. 8, pp. 7700, 7701.]

In Admiralty. On exceptions to libel.

Oglesby Young and Bauer & Greene, for libelant.
Williams, Wood & Linthicum, for respondents.

WOLVERTON, District Judge. On November 17, 1907, the steamer Mackinaw was lying at anchor at the Irving dock, a short distance south of the landing of the steam ferry W. S. Mason, operated by the city of Portland and Multnomah county between the east and west banks of the Willamette river. While the libelant was standing upon one of the pontoons of the approaches used by the ferry, the Mackinaw changed her berth by backing downstream, and the libel alleges that she negligently allowed her anchor to drag along the bottom of the river, resulting in the anchor fouling the ferry cable, whereby the cable was torn loose from its fastenings. This resulted in its

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

suddenly sweeping across the pontoon upon which the libelant was standing, striking and severely injuring him. He has libeled the ship, and respondents except to the jurisdiction of this court upon the ground that, the pontoon being secured in place by fastenings to the shore, the injury occured on land. The locus in quo is thus described by the amended libel:

"That the slips or approaches to said ferry landings, and the pontoons at which said W. S. Mason lands for the purpose of discharging and receiving freight, passengers, and vehicles, are constructed and placed between high-water mark and low-water mark on said Willamette river, and said pontoon hereinafter referred to was not and is not a part of the land, but is a movable and floatable structure attached to land by cables at one end and below high-water mark and extending into the navigable waters of said river, and at the time of the injury to libelant hereinafter described was within and upon the navigable waters of said river, and was and is raised and lowered with the tide and current thereof; and said pontoon, together with said cable, are used in the operation of said public ferryboat, and constitute, and on the date hereinafter mentioned were, state governmental instruments and aids to navigation in the port of Portland, and to the transportation of freight, passengers, and vehicles on and across the navigable waters of the United States in said port."

A pontoon is nautically described by the Century Dictionary as "a lighter; a low, flat vessel resembling a barge," etc. On the facts alleged, then, it seems reasonably clear that this court has jurisdiction, unless the fastenings described are sufficient to impress upon the pontoon the character of land, and to divest it of nautical significance. That this is the result of the situation taken as a whole is the theory of the exceptants. There certainly is plenty of authority to sustain them in asserting the basic principle that a maritime tort can never occur upon the land; that the damage must be inflicted upon the water; and, although the instrument or cause of an injury, as a vessel, may be upon the water, if the result of the tortious act is impressed against an object upon the land, the admiralty is without jurisdiction to grant relief. The leading case having relevance to this claim is The Plymouth, 3 Wall. 20, 18 L. Ed. 125, where the cause of the injury was a fire aboard ship, resulting from the carelessness of the crew, while the injury itself was the result of the flames spreading to and consuming adjacent wharves or buildings. The causative negligence was clearly upon the water, but the injury was as clearly on land. That case has directed the current of opinion and decision for almost half a century. The Mary Stewart (D. C.) 10 Fed. 137; The Professor Morse (D. C.) 23 Fed. 803 (marine railway case); City of Milwaukee v. The Curtis (D. C.) 37 Fed. 705 (swing bridge); The Mary Garrett (D. C.) 63 Fed. 1009 (wharf); The Belle of the Coast (D. C.) 66 Fed. 62; The Albion (D. C.) 123 Fed. 189; Johnson v. Elevator Co., 119 U. S. 388, 7 Sup. Ct. 254, 30 L. Ed. 447.

If these cases indubitably settled the point that the pontoon in question is realty, as understood at common law, and their authority were insurmountable, further comment on the case made by the libel would be inapposite. But further inquiry is fitting and pertinent: First, because The Plymouth, supra, as regards this situation, is somewhat overshadowed by the later case of the Blackheath, 195 U. S. 361, 25

Sup. Ct. 46, 49 L. Ed. 236; and, second, because other cases, not classified with The Plymouth and its offshoots, have a decided influence here.

As to the first observation, a superficial analysis of the language of the Supreme Court in the Blackheath Case sets the mind running irresistibly toward an enlarged jurisdiction of the admiralty as respects the shore. The court begins its discussion by conceding outright that the beacon, the subject of the injury in that case, "was attached to the realty, and that it was a part of it by the ordinary criteria of the common law." If one thing can be attached to the realty by some projection to the land or shore and still be the subject of a maritime tort, where or how is the line to be drawn against the next thing so attached that is injured by a craft? The manner of connection ought not to be inclusive or exclusive; for an object that is attached by piles certainly is not to be preferred over one that is attached by a cable, or a rope, or other like means of binding to the shore. The eminent jurist who wrote the opinion in The Blackheath Case seems to have had in mind just such incongruities, for, as if emphasizing as an absurdity the deprivation of the admiralty of jurisdiction over things floatable merely because they are in some manner attached or anchored to the shore, we have the following significant expression:

"It would be simple, if simplicity were the only thing to be considered, to confine the admiralty jurisdiction, in respect of damage to property, to damage done to property afloat. That distinction sounds like a logical consequence of the rule determining the admiralty cognizance of torts by place."

And, further:

"But, as has been suggested, there seems to be no reason why the fact that the injured property was afloat should have more weight in determining the jurisdiction than the fact that the cause of the injury was. The Arkansas, 17 Fed. 383, 387; The F. & P. M. No. 2 (D. C.) 33 Fed. 511, 515; Hughes, Adm. 183. And, again, it seems more arbitrary than rational to treat attachment to the soil as a peremptory bar outweighing the considerations that the injured thing was an instrument of navigation and no part of the shore, but surrounded on every side by water, a mere point projecting from the sea."

The decision, in fine, makes it apparent that at least not all things attached to the land along the shores of navigable waters are outside the admiralty jurisdiction, and it seems to me that it would take a great deal of dexterity to deploy around this opinion and succeed in getting back to the jurisdiction circumscribed by The Plymouth. To do so would result in treating a great deal of what is said in The Blackheath Case as obiter. But it is not obiter that a court advances reasons necessary to substantiate its position, which is all the court did in that case in finally concluding that a thing attached to the realty may yet be the subject of a maritime tort. True it is that Justice Holmes says, in effect, that it was unnecessary in The Blackheath Case to reconcile it with The Plymouth, because, as he said, the court was dealing with an injury to an aid to navigation, always the subject of admiralty disposition, which was perhaps one way to avoid saying that the principle of The Plymouth has been carried far beyond its legitimate intendment. But Mr. Justice Brown, a distinguished admiralty judge, in his concurring opinion, says that he accepts the decision as

overruling The Plymouth; and due weight must be given the fact ˏ
he was a member of the court, participated in its deliberations, ana
knew what practical effect the decision was expected to have. How-
ever it may be as to whether The Blackheath Case has overruled or
modified the principle of The Plymouth, it is an unmistakable author-
ity to the effect that the libelant in this case did not necessarily receive
his injury on land simply because the pontoon on which he was stand-
ing when injured was attached to the land by a cable. Nor is the case
alone in this particular field of assertion. The M. R. Brazos, Fed.
Cas. No. 9,898, is equally emphatic. The injury there was to a bath-
house, moored to the shore "by poles and chains, so arranged as to al-
low it to rise and fall with the tide, one end of the chains being fasten-
ed securely to the structure itself, and the other end being attached to
pins inserted in holes drilled in the rocks." No pretense was made
that this structure was in aid of or used in connection with naviga-
tion; yet, notwithstanding, it was held a subject of maritime tort, and
the fact that it was attached to the land was not considered to make
the injury any the less one taking place on the water, which is clearly
within the principle of The Blackheath Case. The court in this last
case observed:

"It is clear that the libelant's bathhouse, though described in his libel as a
'vessel,' was not a vessel constructed or used or intended to be used as an
instrument of commerce or navigation. The test, however, of the jurisdiction
of the courts of admiralty in respect to torts is whether the place of the al-
leged injury was 'on the water.' The Maud Webster, Fed. Cas. No. 9,302, and
cases cited. This structure cannot be said to have become a part of the land.
Its connection with the shore was for a temporary purpose. The testimony
shows that it was a movable structure, moored in this place in tide waters,
for use as a bathhouse during the summer months, the design of the owner
being to disconnect it from the shore in the autumn and float it away to
some more suitable place for laying it up during the winter. The mode of its
attachment to the shore was adapted to this purpose, and was such that it
could be readily disconnected. I do not see that the case is any different from
what it would be if the bathhouse had been moored at anchor in the same
place or out in the middle of the river. The case is clearly distinguishable
from the case of The Maud Webster, cited above, in which it was held that
the place where the derrick which was injured stood had become a part of
the land. The libelant, therefore, has the right to have the case determined
on the merits."

The Arkansas (D. C.) 17 Fed. 383, is a case said by the Supreme
Court in The Blackheath Case to be responsible for the assertion that
the fact that the injured property was afloat should have no more ef-
fect upon the jurisdiction than the fact that the cause of it was afloat,
and such ruling is readily extracted from this portion of the opinion:

"The solution of the question of jurisdiction does not depend, in my judg-
ment, upon the fact of the structure being solid or floating, realty or person-
alty, firmly affixed to the bed of the river or otherwise. It is a question of
place, and of the rightfulness of the structure."

For cases more or less to the same effect, see: The F. & P. M.
No. 2 (D. C.) 33 Fed. 511; Simpson v. The Ceres, Fed. Cas. No. 12,-
881; The Haxby (D. C.) 95 Fed. 170.

After the decision of the Blackheath Case come three adjudications,
and only three, to which my attention has been called, upon this sub-

ject. The first of these cases is Bowers Hydraulic Dredging Co. v. Federal Contracting Co. (D. C.) 148 Fed. 290. The action was to recover the hire of a dredge, under a contract in the performance of which the discharge pipe extended continuously from the dredge to a point about 1,200 feet from the bank of the river. The pipe was run from the dredge over pontoons to the shore, and thence on land to the place of deposit for the dredged material. The libel was resisted, under this state of facts, because the dredge was not at the time engaged in the performance of a maritime contract. The court (after noting the authorities opposed to jurisdiction in such a case) said:

"Upon the above authorities, it would seem that the question of jurisdiction here should be decided in favor of the respondent, but the admiralty jurisdiction has been broadened very considerably by the recent decision of the Supreme Court in The Blackheath, 195 U. S. 361, 25 Sup. Ct. 46, 49 L. Ed. 236. * * * It seems, in view of what has been said in this authority, that such artificial distinctions as arise out of the work of a dredge being performed partly on land, and for the purpose of a land transaction, should not oust the court of jurisdiction of a floating structure which in its ordinary purpose is distinctly maritime."

In The Curtin (D. C.) 152 Fed. 588, the court declined jurisdiction of a libel for damage to a pier, saying that it did not understand The Blackheath to overrule The Plymouth. The latest decision is West v. Martin, 47 Wash. 417, 92 Pac. 334, where the Supreme Court of Washington exhaustively reviews the authorities down to The Blackheath, and reaches the conclusion that it was justified by that case in holding the destruction of a pier supporting a bridge over a navigable river to be a maritime tort. Whether this is following the impetus of The Blackheath Case toward an enlarged jurisdiction to the uttermost is beside the question that this court is certainly warranted in taking jurisdiction in this case on the facts alleged in the libel as above set forth, and, if the proofs substantiate the allegations, in retaining jurisdiction to the end. If it be said the Supreme Court sustained the libel in The Blackheath finally because the beacon was an aid of navigation, as much must be said here for the pontoon. It was a part of the ferry equipment, necessary and essential, and actually used, in its operation. It was, moreover, on the navigable waters of the river, or at least partly so, between high and low water marks, raising and lowering with the tide. It necessarily follows that, when libelant was injured by the vessel while standing upon the same, he received his injury by a maritime agency and in a maritime locality.

For the foregoing reasons, the exceptions to the libel should be overruled.