## THE BART TULLY.

### PATTON-TULLY TRANSP. CO. v. MEMPHIS POWER BOAT CLUB.

(Circuit Court of Appeals, Sixth Circuit. June 4, 1918.)

#### No. 3107.

1. ADMIRALTY ⬤19—JURISDICTION—TORTS—INJURIES TO FLOATING STRUCTURE.

A pontoon wharf being a floating structure, injury thereto by a ship constitutes a maritime tort, of which admiralty has jurisdiction.

2. COURTS ⬤359—JURISDICTION—CONFLICT OF JURISDICTION—RULES APPLICABLE.

Where an alleged tort was committed upon navigable waters of the United States and also within a state, the applicable rules will be determined by the state laws; except where displaced by federal statutes and admiralty law.

3. WHARVES ⬤22—INJURIES TO FLOATING WHARF.

Where a riparian owner moved its floating wharf further into the stream than necessary, and almost to the edge of the channel necessarily used for navigation, it did so at its own risk, and could not recover for damages from waves produced by passing steamers operated with due care.

4. WHARVES ⬤22—INJURY—NAVIGATION—CROSSING BARS—CUSTOM—LIABILITY.

It being customary to force a barge over bars of mud by revolving the stern wheel of a tug at full speed, such act does not constitute recklessness, nor render the tug liable for damages to a pontoon wharf, resulting from waves thus produced.

Appeal from the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Libel by the Memphis Power Boat Club against the steamer Bart Tully, claimed and owned by the Patton-Tully Transportation Company. From a judgment holding both parties at fault and dividing

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the damages, the owner appeals. Reversed and remanded for modification.

Just above the city of Memphis, the Wolf river flows into the Mississippi. A short distance above the junction point, and in the edge of the city, and where the Wolf is running south, are located some sawmills and similar establishments. The logs here cut are brought in large quantities from Tennessee, and from other states up and down the Mississippi river, and are carried in the common flat-bottomed river scows or barges, 160 feet by 30. The barges are pushed by steamboats or tugs. The transportation company owned the stern wheel steam tug Tully (120 feet by 22) and other boats, and was engaged in taking log-laden barges from the Mississippi river up the Wolf river to the sawmills. There had been for years a very large traffic of this kind, and the Wolf river, at this point, was navigable—by every criterion. On the east bank of Wolf river, and just below the sawmills, the Memphis Power Boat Club had its clubhouse and landing station. Its members owned and operated small, light-draft launches or similar boats. It maintained a floating wharf and harbor, composed of five pontoons. The up-river one, 20 feet by 8, was fixed at right angles to the bank and at some distance therefrom, and two right-angled arms or branches, running down stream from each end of the upper one, were each composed of two pontoons, 40 feet by 8. The space between was 13 feet wide. This entire structure was maintained in its selected position by anchors and by moorings to the bank; the separate portions were tied together with cables. It thereby provided a landing wharf on the length of the outer edge, a harbor or shelter between the two arms, and a further harbor between the inner arm and the bank.

The amount of water in Wolf river at this point was largely controlled by the height of the Mississippi. In high and in moderate stages, the channel at this point was wide enough and deep enough, so that there was room for everybody, and there seems to have been no trouble. The occurrences here involved (in October and December) happened at extreme low stage. At that stage, the distance from bank to bank was not over 100 feet, and the water was so shallow that the log-laden barges could not get up without danger of injury to the pontoons. Accordingly, and prior to December, the government had dredged a channel from a point downstream, where there was water enough, up to a point just above the clubhouse and a little below the sawmills. This channel was 4 or 5 feet deep at low water, and was over on the western side of the river, as near the west bank at low water as practicable. With the shallow water and spoil bank to the west, it occupied not more than the west half of the river surface. The river bottom is composed of soft mud, which rapidly accumulates and shifts, and the forcing of a boat or barge through a foot or more of this bottom mud is a common incident for such river navigation. Just at the upper end of the excavated channel, there was an accumulation or bar of this character, and there was, sometimes, considerable difficulty in forcing a laden barge up to the sawmills; but it was accomplished customarily and continually.

On the December occasion in question, the boat club's landing stage—which, all together, made a structure 100 feet by 30—had been moved out into the river about one-half of the way across, so that the outer pontoon was along or near the easterly edge of the excavated channel. Since the Tully and other boats similarly employed, while pushing a barge at this stage of water, could navigate only in the excavated channel, it is clear that the boat club had placed its landing stage not more than 10 feet away from the path that the barges must take, and very close to the paddles of the Tully's stern wheel. While things were in this situation, a barge stuck on the bar, or with its corner on the bank. The Tully used all her power and revolved her wheel rapidly in an effort to force the barge through, and the waves made by the paddle wheel caused one of the nearest pontoons to break away from its fastenings to the next one and be drawn into the wheel and suffer some injury. For this injury, and a prior similar one, the boat club libeled the Tully. The District Court held both parties in fault and divided damages. The owner of the Tully brought this appeal.

R. G. Brown, of Memphis, Tenn., for appellant.

F. S. Elgin, of Memphis, Tenn., for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and SATER, District Judge.

DENISON, Circuit Judge (after stating the facts as above). [1] 1. The alleged injuries to the pontoons were by a ship to a floating structure. They constitute maritime torts, and admiralty has jurisdiction. The Blackheath, 195 U. S. 361, 25 Sup. Ct. 46, 49 L. Ed. 236; Atlantic Co. v. Imbrovek, 234 U. S. 52, 34 Sup. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157; The Mackinaw (D. C.) 165 Fed. 351.

[2] 2. The boat club did not appeal from the decree finding it in fault; but that question must be met and passed before we can decide that it was solely in fault—which proposition is the basis of the transportation company's appeal. The place in question was plainly upon the navigable waters of the United States and was also within the limits of Tennessee; the applicable rules would therefore be determined by the state laws in so far as they were not displaced by federal statutes and the admiralty law. It was claimed that certain Tennessee statutes and decisions forbade a private wharf along the edge of a navigable river, and that therefore the boat club was without foundation of right in maintaining this structure. Whatever might have been thought about this, the Supreme Court of Tennessee, by an opinion filed in May, 1918, in an action as to this very location and between these parties, has expressly adopted the federal rule on the subject, and has distinguished the earlier Tennessee cases relied upon by the transportation company. It therefore becomes necessary to decide whether the boat club's acts were within the limits which the nature of the stream and the character of its navigation prescribed for the rights of a riparian owner. The principles involved are too familiar and well settled to justify discussion. Illustrations may be found in 29 Cyc. 341.

[3] We entertain no doubt that the boat club had the right to have a landing stage or floating wharf at and along this bank for the use of the small boats of its members. A riparian owner's wharf may extend out to the edge of navigability; but this is a relative term. It does not follow that, because there is a 35-foot channel in a harbor, every riparian owner may wharf out to that channel, regardless of his interest in reaching it, or of the obstruction to general navigation which he thereby causes. Particularly must this be true when, as here, the deep-water channel is upon the opposite side of the river, and the building of the wharf to that extreme limit is bound to interfere with the reasonable use of that channel by the boats which must use it.

The draft of the tugboats was 4 feet; the draft of the barges, loaded as customary in low water and as actually loaded at this time, was 3½ feet. The draft of the launches belonging to the members of the club does not appear; but it is shown that they could be and were drawn up close alongside and some of them even partly upon the bank, and it must be assumed that their draft was much less than 3½ feet. It is therefore a reasonably certain inference that the ordinary pur-

poses of a landing stage or wharf for these boats could have been served, as well as ought to be demanded in this 100-foot stream, by pushing out from the bank not more than one-quarter or one-third across—25 to 33 feet. This would have left room for the tugboats and barges to go up on the west side, occupying 50 feet, or one-half the channel from bank to bank (that being the width of the barge plus 10 feet on each side), and would have left a fair clearance space between this zone of barge navigation and the pontoons. Under these conditions, and making reasonable adjustment of the relative rights of the parties, we are clear that the boat club could not fix its pontoons out any farther into the channel, except at its own risk of injury by the ordinary and reasonably necessary operation of the tugboats and barges passing along. Further, a mere wharf or landing stage is not the thing here involved. Not satisfied with that, the boat club put out a second line of pontoons, extending more than 20 feet further out, making a harbor between the two, and occupying half the river. We therefore must agree with the court below that the boat club was at fault.

[4] 3. It only remains to consider whether the tug and barge were operated with due and ordinary care, for, of course, the tug might not recklessly or wantonly injure the pontoons, even if they were occupying water that the relative rights of the parties did not justify. We find nothing to indicate recklessness or want of ordinary care and skill under the circumstances. It was certainly customary at this locality, as it is said to be generally customary in this class of navigation (see Western Co. v. Inman Co. [C. C. A. 2] 59 Fed. 365, 367, 8 C. C. A. 152), to force a boat through or over a foot of soft mud on the bottom. The bar in question existed, and it must be crossed, or this traffic must cease—until higher water. There is no claim in the pleadings or in the testimony that revolving the stern wheel at full speed for a few minutes in an effort to overcome an obstacle is not a common and ordinary incident of such navigation. Whether the barge ahead of the tugboat actually struck this bar, or whether one corner grounded on the channel bank, is not important. There is nothing to support the inference of recklessness, except the fact that the injury happened; and when we observe that the boat club had so placed its pontoons that injury was certain, if the tug deviated 20 feet from its ideal line of navigation, the happening of the injury lends no support to the inference. Especially is this true when we also observe that the injury happened because the pontoon fastenings gave way.

4. The October incident is controlled by similar considerations. Indeed, the relative right of the boat club was rather better in December, after the digging of the channel had thrown the barge navigation zone to the extreme west.

5. There is nothing in the recent decree of the Supreme Court of Tennessee inconsistent with our conclusions; nor is it important that the transportation company at a nearby point maintained a dry dock extending further out than these pontoons. The stream was there much wider.

We conclude that the boat club was solely at fault, and the decree below should be modified accordingly. For that purpose it is reversed, and the case remanded.