## NORRIS GRAIN CO. v. GREAT LAKES TRANSIT CORPORATION.

### No. 4891.

Circuit Court of Appeals, Seventh Circuit.

March 30, 1934.

Single & Hill, of New York City, and Ekern & Meyers, of Chicago, Ill. (Douglas D. Crystal, of New York City, and Luther F. Binkley, of Chicago, Ill., of counsel), for appellant.

Brown, Ely & Richards, of Buffalo, N. Y., and Mayer, Meyer, Austrian & Platt, of Chicago, Ill. (Laurence E. Coffey, of Buffalo, N. Y., and David F. Rosenthal, of Chicago, Ill., of counsel), for appellee.

Before SPARKS, FITZHENRY, and PAGE, Circuit Judges.

PAGE, Circuit Judge.

This is an appeal from a judgment of the District Court dismissing the libel of appellant brought to recover $9,861.71 damages occasioned by failure of appellee to deliver a shipment of 160,000 bushels of corn in as good condition as when received. The defense is that the damage resulted from a "peril of the sea." When appellee's steamship Chicago, that left Chicago at 4:50 p. m., November 8, 1926, was out about 100 miles, it ran into a severe storm.

Captain Ebisch of the Chicago testified that for twenty-four hours after 2 o'clock on the morning of the 9th the wind went up and down with varying velocity and as high as sixty to seventy miles per hour, and that the deck that was about twenty feet above the water line was continuously awash. The captain had sailed the inland lakes for nearly thirty years and said it was the heaviest sea he had seen on Lake Michigan, but that he had seen storms that bad on other lakes. He testified that in the month of November they generally got pretty rough weather and there were many serious storms so that loaded boats very frequently had their decks awash. The effect on the ship Ebisch said was: "She strained and labored hard, trembled at times. There was no damage to the upper works but a water tank was carried away—some windows in the fore and aft cabins were blown in and some rivets in the butts were started in the straining of the ship."

When other witnesses from the Chicago were called, counsel said appellant did not intend to call any witnesses to contradict the testimony of Captain Ebisch, but his testimony was not anywhere admitted to be a true statement of the conditions existing during the storm.

Although Captain Ebisch testified that he knew what a marine protest was and that it was his idea that a protest was entered by a master when he had traversed a sea and sustained weather because of which there was likely to be some damage to the cargo, yet when he tied the Chicago to the dock in Buffalo on the night of November 12th and notified the representative of appellant thereof, he says he inspected the cargo and found no evidence of water or other damage, and that although he notified appellee that he had sustained rough weather he

said nothing about it to appellant, and filed no protest until something like twelve days later and after he had been told that the cargo was damaged.

The captain seems to have been honest but careless in his examination, because nearly 10 per cent. of his cargo was then damaged by water.

Appleton & Cox, New York, wrote to appellee on November 15th saying:.

"We insured a considerable quantity of grain on board the SS 'Chicago' on her last voyage from South Chicago to Buffalo. We shall continue to insure this cargo during the winter storage period.

"Would you please advise us whether the vessel met with any peril during this last voyage, and whether a protest has been extended or is to be extended covering this voyage. We desire this information in order that we may take steps to minimize damage to the cargo, if any."

Appellee received that letter on November 16th but made no answer until November 23d, when appellee wired Appleton & Cox as follows: "Please see your letter November fifteenth about storage cargo of corn loaded to our Steamer Chicago Stop Vessel encountered heavy weather on the down voyage and we have report from grain inspectors representing consignee that considerable cargo has been damaged. Advise."

 Appellee's contract was to carry and deliver the cargo in good order and condition (dangers of navigation, fire, and collision excepted). Dangers of navigation are said to mean "perils of the sea." A "peril of the sea" is that danger that comes when wind and wave in their fury work their will with ship and cargo after the owner has used all reasonable effort to make the ship seaworthy and well qualified to withstand those hazards and perils that the owner knows or has reason to believe must be encountered. The language of Admiral Smyth's Sailors Word-Book is even stronger. He says it "does not mean danger or hazard but comprises such accidents as arise from the elements and which could not be prevented by any care and skill of the master and crew." What could, or in the exercise of reasonable care might, have been prevented by the owner, the master, and crew, must be first determined from a consideration of all the facts and circumstances surrounding the service that was to be rendered, before it can be determined wheth-

er the admitted damage resulted from a "peril of the sea." Although Captain Ebisch testified that the storm was as bad as any he had ever seen on Lake Michigan, he also testified that he had seen as bad or worse storms upon the other lakes, and that during the month of November when such storms are frequent and to be expected the decks of loaded vessels are frequently awash. Appellee and the captain of the Chicago knew that in addition to Lake Michigan it had to traverse Lakes Huron and Erie. The Chicago was a package and not a bulk freighter, and in its sides the openings or gangways necessary in a package freighter are not necessary in a bulk freighter, and when the boat was being used as a bulk freighter they were, because of the liability to permit water to get into the cargo, a menace and a danger to the cargo. From the evidence it seems that even in more moderate storms than the one in question there would likely have been some leakage. The gangways should have been made like the solid unbroken side of the ship. The Tenedos (D. C.) 137 F. 443. Opening through the upper deck were nine hatchways thirty feet long, and around the opening were coamings nine inches high, and there were wooden hatches placed over the coamings, closing the hatchways, but as Ebisch said there were no rubber gaskets as there were at the gangways. Over those hatches were placed tarpaulins which were fastened down and made secure by various appliances. The court asked Captain Ebisch: "Were they watertight?" Answer: "Well, they were as tight as any lake vessel hatches always are."

 Manifestly it was the plain and primary duty of appellee to make those hatchways water-tight, and that with proper care it could have been done would seem to be apparent without the necessity of any evidence. The fact is in the record that there was no leakage at either the sides or ends of any of the hatchways and that five of the nine were made absolutely water-tight. Four of them leaked, but only at the corners, which indicates negligence or carelessness in the attempt to make them water-tight. Appellee in its answer said that because of the violence of the storm certain of her hatch coverings were loosened and showed that water made its way into the cargo, but the uncontradicted evidence of all those who saw those coverings after the arrival of the Chicago at Buffalo is that they were as they were when put on and that they were not loosened or disarranged in any way.

■ Captain Ebisch made a statement about the hatchways, that should have been considered. Speaking of the hatchways, he said: "Well, they are not rubber gaskets like the gangways." Until the tarpaulins were put over them, the pine board hatches were simply placed over the coamings around the hatchway openings. If there had been what the witness called "rubber gaskets" put around the coamings, there could probably have been made a water-tight joint between the coamings and the hatches. The only other place where it is shown that there was any leakage was in some unidentified butts because of loosened rivets. The witness Smith, who said he knew nothing about the condition of the ship on the day it arrived at Buffalo and did not examine it until the 24th day of November, when asked: "And on the tank top, how do you attribute the water getting in?" Answered: "The rivets in the butts which were started in the straining of the ship." It is possible that Smith saw that the rivets were "started" and that he might reasonably infer that that came from the straining of the ship, but he did not attempt to say, and could not possibly know, when those rivets were loosened. How many rivets were loosened does not appear. There is no evidence that after the discovery of the damage to the cargo any repairs of any kind were made upon the ship. Much dependence is placed upon examinations made of the ship on October 5, 1926, by the inspector of hulls, and others. It appears from the certificate of inspection and from the testimony of the various persons who made those inspections that no inspection had anything whatever to do with the gangways, the hatches, or, so far as appears, with the butts where it is said the rivets were "started." Inspection of the whole boat by the person who made the general examination was very cursory. He said he went over the deck, but his whole examination of the boat, that was over 300 feet long, consumed between one-half to one and a half hours. The boat was an old boat, and from anything that appears the rivets in question and many others might have been "started" before the trip to Buffalo. True, several persons said the ship was seaworthy, but before a ship can be said to be seaworthy there must be more than a tight hull, a sound rudder, and a working engine. "Seaworthiness" means such fitness as to structure, lading, captain, crew, etc., as will enable a ship to encounter the winds and battering waves of the seas that must be encountered during the season and in the places where the ship must travel so that its cargo will be carried safely and delivered in good condition, as appellee in this case contracted to do.

So far as Captain Ebisch knew, appellee's ships never before carried grain or any other perishable bulk freight in its freighters, but their bulk cargoes were generally of stone or coal.

Early in the summer of 1926 a cargo damage was caused by leakage at loosened rivets, and repairs were made at Buffalo; but it is not even suggested that that damage was from a "peril of the sea."

■ We are of the opinion that the ship when it left Chicago had not been made seaworthy for the purpose of carrying a bulk load of grain into the November storms that it was known probably must be encountered upon those lakes, and the damage done was not the result of a "peril of the sea."

The final decree of the District Court is hereby reversed, and the cause remanded, with directions to enter a decree in favor of appellant for full damages together with costs.