**INTERLAKE IRON CORPORATION v. GARTLAND S. S. CO.**

No. 8512.

Circuit Court of Appeals, Sixth Circuit.

June 25, 1941.

Henry N. Longley, of New York City (Bigham, Englar, Jones & Houston, of New York City, Butterfield, Keeney & Amberg, of Grand Rapids, Mich., Henry N. Longley and John W. R. Zisgen, both of New York City, and Harry Shulsky, of Grand Rapids, Mich., on the brief), for appellant.

Lee C. Hinslea, of Cleveland, Ohio (Duncan, Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, Warner, Norcross & Judd, of Grand Rapids, Mich., Lee C. Hinslea and Robt. G. McCreary, both of Cleveland, Ohio, and George S. Norcross, of Grand Rapids, Mich., on the brief), for appellee.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

The steamer "Burlington," loaded with pig iron, stranded at the entrance to the harbor at Holland, Michigan, and with part of her cargo became a total loss. The appellant filed its claim for the value of the lost iron and for the cost of salvaging recovered cargo. The appellee, owner and operator of the Burlington, while denying liability for the loss and claiming exoneration, also petitioned for limitation of liability. The decree exonerated the appellee from liability for all loss, damage, destruction, or injury occasioned by the loss of the steamer, and dismissed the claim. Though conceiving it unnecessary to make any finding upon the appellee's petition to limit liability, except as it might become important upon appeal, the court concluded that the loss or damage to the appellant's cargo was incurred without the privity or knowledge of the appellee, and that the latter was entitled to limit its liability under §§ 4283 and 4285 U. S. Revised Statutes, 46 U.S.C.A. §§ 183, 185.

The court made detailed findings of fact upon evidence, in respect to which there is little controversy. The Burlington was a steel vessel 258 feet long, 42 feet 6 inch beam, and 26 feet molded depth. It was loaded at the appellant's dock at Toledo, Ohio, with approximately 2,217 gross tons of pig iron belonging to the appellant, and 120 tons of bunker coal, the iron for delivery to the Harrington Coal Dock at Holland. Upon completion of the loading the draft of the vessel was 17 feet forward and 18 feet 4 inches aft. When it arrived in Lake Michigan off the entrance to the harbor at Holland, shortly after midnight on December 6, it was estimated that the draft of the ship, due to consumption of coal on the voyage, was 17 feet 3 inches forward and 17 feet 6.1 inches aft.

The Harrington Coal Dock at Holland is situated about six miles inland from Lake Michigan at the head of Lake Macatawa. It is reached by vessels from Lake Michigan through a passage between two piers or breakwaters to a stilling basin, thence between two inner piers to Lake Macatawa and thence through a dredged channel in Lake Macatawa to the dock. When the Burlington was about three-fourths of her length within the outer piers, she stranded in midchannel, and though the master succeeded in releasing her, wind and sea carried the vessel northward and hard aground north of the north breakwater, where, in a severe gale which arose, she became a total loss. Immediately after the stranding, a member of the United States Coast Guard reported that the water was down about 2½ feet.

The War Department of the United States, charged with the duty of preparing navigation charts for vessels on the Great Lakes, and conducting investigations of lake water levels, in bulletins and supplements for 1936 which were sent to and read by the appellee and its master, set out in Supplement No. 2, issued July, 1936, the depth of water in the approaches to Holland at low water datum level after completion of dredging operations on June 6. The depths shown therein were as follows: 21 feet 7.2 inches over the entrance bar in Lake Michigan; 19 feet 6 inches in the stilling basin; 19 feet between the inner piers, and 18 feet in the Lake Macatawa channel to the Harrington Coal Dock. In Bulletin No. 45, issued April, 1936, it was set forth that the level of water in Lake Michigan varies seasonally, the highest stage being in the summer months and the lowest in the winter, and that in addition to seasonal variations the direction and velocity of the wind cause local variations in water levels. It also pointed out that in addition to annual fluctuations there are occasional oscillations of irregular amount and duration resulting from variations in barometric pressure which may produce changes ranging from a few inches to several feet, and that at other times the level is affected by winds of such velocity to drive the surface water forward in greater volume than that carried by the lower return currents, raising the elevation on the lee shore and lowering it on the weather shore, although in recent years the injurious effects of storm waves in inner harbors have been relieved by the formation of a wave-stilling basin enclosed by breakwaters or piers, and that such basins exist at a number of harbors on Lake

Michigan, including that at Holland. It was noted, however, as of especial importance to navigation interests, that dangerous storms of the fall, winter and early spring are usually westerly, making entrance to the restricted harbor channels of the east shore especially difficult, and sometimes increasing dangers by the formation of storm bars.

The court found that the average level of Lake Michigan for the Decembers of 1932 to 1935, inclusive, was about 8½ inches below low water datum, and that the master and owner of the Burlington knew that the depth of water to be expected on approaching Holland in December would probably be less than that depicted on the charts. Neither made any inquiry as to water levels before the vessel broke ground at Toledo, and after sailing the master could not ascertain the actual depth prevailing at Holland because the Burlington neither carried nor was required to carry radio. Nevertheless, the court also found that the draft of the vessel upon arrival at Holland was not too deep for the harbor at that season of the year, provided the water had been normal, and that the master could not reasonably have anticipated that it would be abnormally low, and was, therefore, justified in attempting to enter. It concluded furthermore, that the conditions in Lake Macatawa were not of controlling importance because if the vessel had reached the channel therein the disaster would not have occurred, and finally that the abnormal lowering of the water at the pier was caused by a phenomenon known as a "seiche," which results from variations in barometric pressure and such phenomenon is entirely unpredictable and could not reasonably have been expected.

The conclusions were that the steamer Burlington was, on December 2, in all respects seaworthy, properly manned and equipped, that due diligence had been exercised to make her so and that the loss was caused by a peril of the sea or danger of navigation which could not have been prevented or avoided, and since the uniform bill of lading issued by the master contained a clause exempting the carrier from liability for loss of cargo by reason of the dangers of navigation, the appellee was exonerated from all liability.

■ It is the contention of the appellant on the main issue in the case, that when the Burlington sailed from Toledo she was unseaworthy for the voyage on which she embarked, in that she was so heavily laden she could not be expected safely to navigate to her destination at the Harrington Dock, that due diligence was not exercised to make her seaworthy in that respect, and that the vessel stranded not as the result of dangers of navigation but because of her unseaworthiness. With this contention we must agree. The expectable depth of water in Lake Macatawa was 17 feet 3½ inches, less some allowances for shoaling, and without consideration to the direction and velocity of the wind. To have expected the Burlington safely to navigate Lake Macatawa with a draft of 17 feet 3 inches forward and 17 feet 6 inches aft, was to rely upon calculations too nice to constitute due diligence. It is suggested that if the draft of the ship was too much for the dredged channel the Burlington could have safely plowed through the soft mud at the bottom of the lake from the entrance piers to the dock, a distance of about six miles. Reliance is placed in cases such as The Bart Tully, 6 Cir., 251 F. 856; Western Union Co. v. Inman Co., 2 Cir., 59 F. 365, which hold that there is no lack of diligence in forcing a ship through a slight bank of soft mud or sediment for a short distance where it is customary for ships to be so navigated, where there is no sharply defined bottom of the stream, and where experience has demonstrated that the soft, yielding mud admits of navigation through it. These cases furnish no support for the present contention. There is no evidence that it was the custom of navigators to plow through the mud in Lake Macatawa, that it was considered safe to do so, that it ever had been done, or that the bottom was of such consistency as to permit it being done, and the distance to be covered was approximately six miles and not merely the traverse of a bar caused by silting. The vessel was unseaworthy if she could not reasonably have been expected to make the voyage on which she was embarked, a voyage which included the delivery of her cargo at the Harrington Coal Dock at Holland.

■ It is the rule that seaworthiness is warranted at the beginning of a voyage upon which the vessel embarks. May v. Hamburg, etc., Gesellschaft (The Isis), 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348; The Benjamin Noble, 6 Cir., 244 F. 95;

270

Norris Grain Co. v. Great Lakes Transportation Corp., 7 Cir., 70 F.2d 32.

 While there had been some difference of opinion as to whether a shipowner who negligently omits to make his vessel seaworthy may have the benefit of § 3 of the Harter Act, 46 U.S.C.A. § 192, to rid himself of liability to the owners of the cargo for damages resulting from the negligence of the master or the crew if there is no causal relation between the defect and the disaster, it is now settled that if unseaworthiness is not the proximate cause of the loss the vessel may not be charged with damages. May v. Hamburg, etc., supra. So it is urged upon us that even if the Burlington were too heavily laden to negotiate the channel in Lake Macatawa, the fault in this respect was not the proximate cause of the stranding since the disaster did not occur in Lake Macatawa but at the entrance to the stilling basin, and so there is no causal relationship between the lack of diligence of its owners and the injury that occurred. In the careful and exhaustive study we made of the applicable rules governing determination of proximate cause in Johnson v. Kosmos Cement Co., 6 Cir., 64 F.2d 193, we came to the conclusion that the sounder rule required that causal relation be recognized whenever the thing done or omitted produces immediate danger of injury and is a substantial factor in bringing it about even though the precise result may not be foreseen. The test of proximity has been satisfied if a generally dangerous result was within the realm of expectability. That is also the rationale of Norris Grain Co. v. Great Lakes Transportation Corp., supra, where the court pointed out that even if the storm encountered by the vessel involved in that case was unusual for Lake Michigan, it was one which was expectable during the voyage as a whole. We are unable, therefore, to agree that the conditions existing at Lake Macatawa are not of controlling importance. Had the ship been of such draft as would have made traverse of Lake Macatawa reasonably safe, including a fair margin for error in calculation and seasonal variation, it is reasonable to conclude that she would not have stranded at the entrance to the harbor.

 The contract of carriage was personal to the appellee. Section 4283 of the Revised Statutes provides that the liability of a shipowner for loss or damage to a cargo if occasioned or incurred without his privity or knowledge, shall not exceed the amount or value of the interest of the owner in the vessel and her freight then pending. It has uniformly been held, however, under this statute, that where the contract is personal there is a warranty of seaworthiness and lack of the owner's privity or knowledge will not permit of limitation. In re Great Lakes Transit Corp., 6 Cir., 81 F.2d 441, and cases therein cited. While the bill of lading later issued exempted the owner from liability for loss "incurred by reason of dangers of navigation," the ship was unseaworthy, if at all, before she broke ground at Toledo, and the damage therefore was not within the exception as resulting from the dangers of navigation or "a 'peril of the sea.'" Norris Grain Co. v. Great Lakes Transportation Corp., supra [70 F.2d 34].

The decree is reversed and the cause remanded for a decree awarding damages to the appellant in the amount established at the trial, together with interest from December 6, 1936, at the rate permitted by law.