**PARK S. S. CO., Limited, v. CITIES SERVICE OIL CO.**

**THE CLEARWATER PARK.**

United States District Court
S. D. New York.

Oct. 3, 1950.

Burlingham, Veeder, Clark & Hupper, New York City, Eugene Underwood, New York City, of counsel, for libellant.

Hatch, Wolfe, Nash, & Ten Eyck, New York City, Barent Ten Eyck, New York City, of counsel, for respondent.

S. H. KAUFMAN, District Judge.

Libellant, the managing owner of the S. S. Clearwater Park, brings this libel to recover damages for breach of a "safe-berth" provision in a charter party. The damages are alleged to have been sustained as a result of the grounding of libellant's vessel in Hingham Bay, Boston Harbor, in December 1945 and in January 1946, while under charter to respondent.

On November 9, 1945, libellant chartered the Clearwater Park, a Canadian Liberty-type tanker, to respondent for two consecutive cargoes of crude oil from one safe port in Venezuela to one safe port in the United States, north of Hatteras, Norfolk/Portland range, at charterer's option. The charter party was on a printed form. The original "safe-berth" provision was deleted and a typewritten clause, which did not differ substantially, was substituted. The relevant portion of the substituted clause reads: "The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided that the vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer * * *."

On or about November 9, 1945, respondent ordered the Clearwater Park to load at Las Piedras, Venezuela and designated "Boston Harbor Hingham Bay Anchorage into lighters" as the place and manner of discharge on the first voyage. Identical instructions were given by respondent on or about December 6, 1945 for the second voyage.

Hingham Bay is a small bay in Boston Harbor. It is approached from the north through President Roads and Nantasket Roads. A vessel destined for a Hingham Bay anchorage passes south through Nantasket Gut, an opening between Peddocks Island on the west and that portion of Hull Island on the east which is called Windmill Point.

Although there is a great deal of shallow water in Hingham Bay, the then current United States Coast and Geodetic Chart No. 246 indicated an anchorage area in the bay, roughly oval in form, with over 30 feet of water at mean low tide. This area lies south of Nantasket Gut and is approximately 2,700 yards long on its north-south axis and 700 yards wide at the widest point on its east-west axis. An identical anchorage area was indicated on the then current British Admiralty chart, No. 1516, which was the only chart with which the Clearwater Park was equipped.

On the first voyage, the master of the Clearwater Park sent a message to libellant's Boston agents on December 15, 1945 advising them of the vessel's expected arrival time at Boston. Libellant's agents passed on that information to the Boston Pilots' Association and also informed the latter that the vessel was destined for respondent at Hingham Bay. The Clearwater Park arrived in Boston on December 17, 1945. She was boarded by a pilot that afternoon and proceeded into Boston Harbor, where she anchored at President Roads and was granted pratique.

The next morning, pilot Merton A. Cleverly, concededly a "specialist" in the waters of Hingham Bay, was put aboard. The vessel hove up anchor and proceeded to Hingham Bay, where she anchored at a place designated by Cleverly at 10:04 a. m., on one anchor with 50 fathoms of chain on the windlass. On arrival, the Clearwater Park had a mean draft of 26' 7½" and a draft aft of 28' 5". Bearings taken at that time and entered in the log indicate that Windmill Point bore 5 degrees and was distant 4½ cables. No soundings were taken. If these bearings are plotted on the British chart then on board the Clearwater Park, it will be found that she anchored at a place where there was only 31½ feet of water at mean low tide and that she was only 300 feet within and to the east of the 5 fathom curve indicated on that chart. The same bearings plotted on U. S. Hydrographic Survey Sheet H-

6642 show that she anchored in approximately 30 feet of water at mean low tide and that less than 100 yards to the northwest, west and southwest the depth was 26' at mean low tide.

The Clearwater Park began discharging into lighters that day and continued until early in the afternoon of December 19th. She stopped when snow began to fall and a wind, blowing from the northeast at about 35 miles per hour, reached the proportions of a moderate gale. The wind and snow continued unabated until early the next afternoon. As the weather cleared, it was observed that the Clearwater Park had dragged anchor. No bearings were taken of the place to which she had dragged. The vessel was shifted by its officers to a point from which Windmill Point Light bore North 3 degrees West magnetic and Nantasket Hill Tower bore North 65 degrees East magnetic. She anchored on one anchor with 50 fathoms of chain out in over 50 feet of water. The closest dangerous shallow water was some 300 yards to the east.

Although she slacked chains to 70 fathoms on the afternoon of December 20th, about noon of the next day she was sheering to cross currents and dragged anchor in the strong tide. She was again shifted by her officers and anchored on one anchor with 60 fathoms of chain out at a point from which Windmill Point Light bore North 3 degrees West magnetic and Nantasket Hill Tower bore North 75 degrees East magnetic. The bearings indicate that she was anchored at a place where there was 44 feet of water at mean low tide.

Discharging was completed on December 22nd without further incident. The following day at about 4:00 p. m. the Clearwater Park departed for Venezuela with a new master, who had come aboard a few hours before sailing. At that time the vessel's personnel was completely unaware of any fact which would indicate that she had touched bottom during her stay at Hingham Bay.

On December 29th, while at sea, salt water was discovered in one of the tanks of the vessel and, on inspection, it was found that the vessel's bottom had been slightly indented. Although appropriate entries of these discoveries were made on January 4, 1946 in the ship's log, the spaces provided for the place, date and hour of occurrence were either not filled in or marked "unknown".

Prior to the first voyage from Venezuela to Hingham Bay, and in September 1945, the Clearwater Park had been in drydock. The ship's officers testified that she had not touched bottom between that date and the time of her arrival at Hingham Bay, and between the time she sailed from Hingham Bay and the time the bottom damage was discovered. Under these circumstances, it is reasonable to infer that the Clearwater Park touched bottom some time during her stay at Hingham Bay between the 18th and 23rd of December. In all likelihood it occurred when the vessel first dragged anchor for at that time there was a wind of 35 miles per hour blowing from the northeast with dangerously low water about 100 yards to the west and southwest.

On January 1, 1946 the Clearwater Park began loading her second cargo at Las Piedras, Venezuela. At or about the same time the master learned that she was destined for Hingham Bay. Prior thereto the master had expressed doubt as to the safety of Hingham Bay, when the mate had informed him that the vessel had dragged anchor there twice while discharging. Accordingly, the master wired the vessel's operators "Suggest have safer anchorage discharge Boston as I do not consider Hingham Bay safe for this type ship in winter months." Although no specific reason was assigned by the master, the evidence shows that his fears were founded solely on the poor holding quality of the bottom at Hingham Bay and not on the sufficiency of the depth of the water in the bay or the possible presence of uncharted rocks.

On January 7th respondent's agents in New York were notified of the master's suggestion. No reason was assigned and none was communicated to respondent or its agents, other than the general statement of the master that he considered Hingham Bay unsafe. On January 10th, libellant's agents were informed that the master's

suggestion had been rejected and that the Clearwater Park was to discharge at Hingham Bay anchorage.

While these communications were being exchanged, the master had sent a message to libellant's agents in Boston advising them that the Clearwater Park was expected to arrive on January 11, 1946. Libellant's agents advised the Boston Pilots' Association of that fact and also informed them that the vessel was destined for respondent at Hingham Bay. The vessel arrived in Boston early on the morning of January 11th. She was boarded by a pilot who took her to President Roads, where she anchored at about 6:00 a. m.

That afternoon she hove up anchor and proceeded to Hingham Bay under the direction of pilot Cleverly. She anchored in Hingham Bay at a place designated by Cleverly at about 5:00 p.m. on one anchor with 60 fathoms of chain out. Her draft forward was 26′ 3″ and her draft aft was 27′ 6″. Her heading was south by east. The weather was clear and the wind westerly and moderate, about 10 to 15 miles per hour. The vessel anchored about 35 minutes before high water and at the beginning of the ebb tide, which was setting to the north. Anchor bearings indicate that she was in a position from which Graves Light bore 28 degrees true and Windmill Point Light bore 336 degrees true. According to the British Admiralty Chart on board the Clearwater Park, these bearings would place the vessel in approximately 36 feet of water at mean low tide and some 200 feet within and to the west of the five fathom curve, outside of which the depth was 27 feet or less at mean low tide. About 650 feet and 900 feet to the north and northwest, respectively, the most southerly portions of two shoal areas, with a depth of 27 feet, appeared on the British chart. Although no soundings were taken when the vessel first anchored, these bearings were plotted on the British chart on board the Clearwater Park and checked by the master, who testified that he considered the vessel's position "all right".

The then current U.S. Coast and Geodetic Chart No. 246 showed a 24 foot shoal area approximately 800 feet north of the place where the vessel anchored. United States Hydrographic Survey Sheet H-6642, in addition to the 24 foot spot, also showed an 18 foot spot some 750 feet northwest of the position in which the bearings placed the vessel.

The Clearwater Park began discharging at about 7:45 p. m. and filled her first barge two hours later. This lowered her mean draft to approximately 25′ 3″. At or about this time it was observed that the vessel was listing to port. Soundings were taken over the starboard side, which showed ample water fore and aft. However, soundings amidships showed as little as 16 feet of water, where she was hard aground.

Anchor bearings taken at this time showed that Nantasket Hill Tower bore 65½ degrees and Windmill Point Light bore 339½ degrees, which would place the vessel about 800 feet north of her position when she first anchored. The difference in these positions can be attributed either to the ebb current's northerly flow, which resulted in stretching the anchor cable to its full extent; or to the fact that the bearings, taken at the time the vessel first anchored, were not precise. An error of ¼ degree on the Graves Light bearing, which was about 5 miles away, would result in a discrepancy of 200 feet in the north-south position of the vessel. In all likelihood, the difference can be attributed to a combination of both factors. The evidence does not support the conclusion that the Clearwater Park dragged anchor at this time.

The vessel remained aground until early the next morning, when she floated free on the incoming tide. At about 8:30 a. m. she was anchored at another spot by her officers, where she remained for the balance of her stay without further incident. An examination disclosed that the Clearwater Park had suffered considerable bottom damage as a result of the grounding. Accordingly, on her departure, she proceeded to Halifax for repairs.

Libellant contends that respondent failed in its obligation to designate and procure a safe place pursuant to the terms of the charter, in that it failed to designate and procure the exact spot within Hingham Bay

where the vessel was to anchor; that on each occasion the vessel was anchored in an unsafe spot by the local pilot, and that the pilot's selections are to be attributed to respondent, either because it employed him or because he was performing respondent's work when he made the selections. Libellant also contends that since the "safe-berth" clause was breached by respondent, and since the master of the Clearwater Park was entitled to and did rely on the covenant, respondent should be held liable for the damages sustained. See Cities Service Transp. Co. v. Gulf Refining Co., 2 Cir., 79 F.2d 521.

Under the terms of the charter, respondent had the option of naming a safe port of discharge. The charter also provided that the vessel was to "discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided that the vessel can proceed thereto, lie at, and depart therefrom always safely afloat * * *."

Under this clause, respondent could properly order the Clearwater Park to discharge into lighters from an anchorage in a bay; and, in accordance therewith it designated "Boston Harbor" as the port, and "Hingham Bay Anchorage" as the place, of discharge. Libellant contends that this designation was not sufficiently precise under the "safe-berth" clause of the charter.

■■■ As heretofore noted, the anchorage area within Hingham Bay was only 2,700 yards long and 700 yards wide at its widest point; and, since the width varied greatly, the entire length was not available as an anchorage for a vessel of the size of the Clearwater Park. Generally, the privilege of designating the exact spot for discharge is of commercial value, for it enables a charterer to keep to a minimum the cost of transporting cargo from a vessel to its ultimate destination. However, in the instant case no possible economic benefit could accrue to respondent from such a privilege; for its purposes, any place in Hingham Bay was of equal value. On both voyages respondent made the same designation and on neither occasion did libellant object to it as not being sufficiently precise.

Under these circumstances, it would be unreasonable to construe the charter provisions as calling for anything more precise. Certainly, the conduct of the parties indicates that nothing more was contemplated. Perhaps a more precise location would have been called for if the anchorage area were sufficiently large to accommodate more than one vessel; but the evidence shows that only one vessel of the size of the Clearwater Park could be accommodated safely in Hingham Bay, at one time. In view of these facts, the designation of "Boston Harbor Hingham Bay Anchorage" was a sufficiently precise designation of a "place" under the terms of the charter. Moreover, since Hingham Bay was available to all vessels without the necessity of making any special arrangements for its use, respondent, by designating that place, fulfilled its obligation to "procure" it.

■■■ Since respondent was under no obligation to designate or procure the exact spot within Hingham Bay where the vessel was to anchor, the pilot, in selecting the anchorage, was not performing respondent's work. Under these circumstances, the "borrowed servant" doctrine is inapplicable. Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480. Nor can the pilot's selections be attributed to respondent on the theory that he was actually employed by it. On the contrary, the evidence shows that he was employed by libellant. It was libellant who informed the Boston Pilots' Association of the expected arrival of the Clearwater Park and that it was destined for Hingham Bay on each occasion. On each occasion, libellant paid the bill for that pilotage, half going to the pilot who piloted the vessel to President Roads and the other half to Cleverly for his services in piloting the vessel from President Roads to Hingham Bay. Under these circumstances, the pilot was the employee of libellant, and the fault, if any, of the pilot in selecting the anchorage is to be attributed to libellant.

Having determined that respondent was under no duty to designate the exact spot in Hingham Bay where the Clearwater Park was to anchor and that the fault of the pilot, if any, is to be attributed to libel-

lant, it becomes necessary to ascertain the precise scope of respondent's obligation under the terms of the charter. The designation of "Hingham Bay Anchorage" by respondent was a compliance with its obligation to designate and procure a place of anchorage. However, respondent also covenanted that the place it selected would be one where the Clearwater Park could proceed to, lie at, and depart from always safely afloat.

In ascertaining whether or not Hingham Bay was such a place, it is relevant to note that the purport of the evidence is that vessels of substantially the same size, type and draft as the Clearwater Park could and actually did anchor in Hingham Bay without mishap, both prior and subsequent to the time when the Clearwater Park touched bottom. Undoubtedly then there were spots in Hingham Bay where the Clearwater Park could have been anchored without danger. Both the then current British and American charts showed a clearly marked and adequate anchorage for a vessel of the type, size and draft of the Clearwater Park. There was a white anchorage buoy in the bay, which appeared on the charts; and the evidence shows that Cleverly customarily anchored vessels some 250 to 300 yards northwest of that buoy, where there was over 50 feet of water, and which would have provided adequate swinging room in all directions.

Primarily, then, Hingham Bay was a safe place, in the sense that the Clearwater Park could have been anchored there without danger. This, in fact, is conceded by libellant. Under these circumstances, it would be unreasonable to interpret respondent's covenant as one which guaranteed the safety of the whole of Hingham Bay. If this were otherwise, libellant would have been entitled to anchor the vessel at any spot within the confines of the bay without incurring any responsibility; a circumstance the parties can hardly be said to have contemplated, since it was perfectly apparent that such a course would have resulted in serious danger.

█ It is fair then to interpret respondent's covenant as one by which it assumed the obligation of being responsible for damages arising from all reasonably foreseeable hazards at those spots in Hingham Bay where a vessel of the size, type and draft of the Clearwater Park would be anchored in the exercise of reasonable care. This would leave the job of navigation to libellant and at the same time it would hold respondent responsible for all reasonably foreseeable hazards if that job were properly done.

Although we can never know with certainty just when and where the Clearwater Park touched bottom on her first voyage into Hingham Bay, the inference from the facts is that it occurred either before or during the time she first dragged anchor. The evidence shows that pilot Cleverly had anchored her in a spot where there was only 30 feet of water, with 26 feet or less approximately 100 yards to the southwest, west, and northwest. This was about 300 yards northwest of the spot which was customarily selected as an anchorage for vessels substantially similar to the Clearwater Park. When the Clearwater Park anchored she had a draft aft of 28' 5" and a mean draft of 26' 7½". Considering the fact that she was 420 feet long, riding on 300 feet of chain, and that the winds from the northeast were not infrequent at that time, it cannot be said that libellant's agents acted with reasonable care in selecting that spot for an anchorage. Respondent, therefore, cannot be held responsible for the damages sustained when she touched bottom in December, 1945.

█ The grounding of January 11, 1946 presents a slightly different problem. On that occasion the Clearwater Park was anchored by pilot Cleverly in about 35 feet of water. She was about 400 yards north of the spot which Cleverly customarily selected. According to the British chart she was only 200 feet within and to the west of the 5 fathom curve, and about 650 feet south and 900 feet southeast of two shoal areas, which showed 27 feet. The then current United States Coast and Geodetic Chart No. 246 showed a 24 foot spot some 800 feet to the north and Chart No. 1207 showed an 18 foot spot in that area. Considering the fact that the Clearwater Park was 420 feet long, and riding on 360 feet

of chain, that on arrival she had a draft aft of 27' 6" and a draft forward of 26' 3," and that she had anchored at the beginning of the ebb tide, which was setting to the north, it cannot be said that a reasonable man exercising reasonable caution would have selected the spot chosen by the pilot. Since the 24 and 18 foot spots were indicated on then current charts, the pilot, who is conceded to have been an expert in Hingham Bay, must be presumed to have known their location. In any event, even on the basis of the information shown on the British chart, it is apparent that Cleverly had anchored her dangerously close to the shoal areas indicated thereon.

■ It is of course true that none of the then current charts was precisely correct. In fact, subsequent to the grounding, a new survey was made, and it disclosed only 13 feet of water at or about the spot where the Clearwater Park grounded. However, since Cleverly had anchored the vessel in a position where she could easily ground on the basis of the then available facts, and since the vessel did in fact ground at or about that spot, the fact that it grounded on rocks whose presence was then unknown cannot relieve him of his fault. Johnson v. Kosmos Portland Cement Co., 6 Cir., 64 F.2d 193, certiorari denied 290 U.S. 641, 54 S. Ct. 60, 78 L.Ed. 557; Interlake Iron Corp. v. Gartland S. S. Co., 6 Cir., 121 F.2d 267, certiorari denied 314 U.S. 681, 62 S.Ct. 181, 86 L.Ed. 545; see Prosser on Torts, 369–72 (1941).

■ Reasonable care in the selection of an anchorage for the Clearwater Park on both the December and January voyages was not exercised by pilot Cleverly. On both occasions he anchored her in potentially dangerous spots, as a result of which the Clearwater Park sustained damage. A pilot, exercising reasonable prudence, could have anchored the vessel in a safe spot. Since the pilot was employed by libellant and since he was performing libellant's work, his fault is to be attributed to libellant. Respondent is not responsible for the damages sustained. The libel will be dismissed and there will be a decree for respondent. Findings of fact and conclusions of law are filed herewith.

Findings of Fact.

1. On November 9, 1945 libellant chartered the vessel Clearwater Park to respondent for two voyages from Venezuela to one safe port in the United States, north of Hatteras, Norfolk/Portland range. The charter contained the following clause: "The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided that the vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer * * *."

2. On both voyages respondent ordered the Clearwater Park to discharge at "Boston Harbor Hingham Bay Anchorage into Lighters". Hingham Bay is a small bay in the southeastern part of Boston Harbor. Although it contains a great deal of shallow water, the then current charts showed an anchorage area, with over 30 feet of water, approximately 2,700 yards long on its north-south axis and 700 yards wide at the widest point on its east-west axis.

3. The Clearwater Park arrived in Boston Harbor in December 1945 and again in January 1946. She was anchored in Hingham Bay by pilot Cleverly, who had been employed by libellant, on both occasions.

4. The spot selected for an anchorage in December, 1945 was dangerously close to shallow waters indicated on the then current charts. The Clearwater Park touched bottom in December, 1945 in those shallow waters.

5. The spot selected for an anchorage in January, 1946 was dangerously close to shallow waters and shoal areas indicated on the then current charts. The Clearwater Park grounded in January, 1946 on an uncharted rock at or about the spot where the then current charts indicated the presence of shoal areas.

6. A pilot, exercising reasonable care, could have anchored the Clearwater Park in Hingham Bay without exposing it to the danger of shallow waters or shoal areas.

Conclusions of Law.

1. This court has jurisdiction of the parties and the subject matter of this libel.

2. Respondent's designation of "Boston Harbor Hingham Bay Anchorage" was a sufficiently precise designation under the terms of the charter.

3. A fair construction of the charter is that respondent assumed the obligation of being responsible for all damages arising from reasonably foreseeable hazards at those spots in Hingham Bay where a vessel of the size, type and draft of the Clearwater Park would be anchored in the exercise of reasonable care.

4. In December 1945 and January 1946 the pilot did not exercise reasonable care in selecting the spots where the Clearwater Park anchored, as a result of which she touched bottom in December 1945 and grounded in January 1946. The pilot's faults are attributable to libellant.

5. Respondent is entitled to a decree dismissing the libel with costs.